**11-4035-cv**
*Irizarry v. Catsimatidis*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: December 13, 2012        Decided: July 9, 2013)

Docket No. 11-4035-cv

BOBBY IRIZARRY, RUBEN MORA, JOSELITO AROCHO, JOSEPH CREMA, ALFRED CROKER, FRANK DELEON, MARIO DIPRETA, WILLIAM HELWIG, ROBERT MISURACA, ROBERT PASTORINO, VICTOR PHELPS, DANIEL SALEGNA, GILBERTO SANTIAGO,

*Plaintiffs-Appellees*,

CARLOS TORRES, on behalf of himself and all others similarly situated, LEWIS CHEWNING,

*Plaintiffs-Counter-Defendants-Appellees*,

RAYMOND ALLEN, LLANOS BLAS, NABIL ELFIKY, MOHAMMED DABASH, CARLOS MARTINEZ, LUIS MORALES, STEVE GROSSMAN, FRANKLYN COLLADO, DAVID ADLER, DINO A. ZAINO, PATRICK LABELLA, ROBERT MASTRONICOLA, ANTHONY BROOKS, VICTOR BENNETT, CANDIDO MOREL, JOSE MARTINEZ, WAYNE HENDRICKS, HAROLD HORN, TROY MILLER, OUSMANE DIATTA, ELLIOT STONE, TINA RODRIGUEZ, GABRIEL KARAMANIAN, BRIAN HOMOLA, ANNA GARRETT, NELSON BETANCOURT, JOSE DELACRUZ, YURI LAMARCHE, MICHAEL GROSECLOSE, RODOLFO DELEMOS, PIO MOREL, ABIGAIL CLAUDIO, MALICK DIOUF, DAVID OTTO, ALEJANDRO MORALES, VICTOR DIAZ, PAUL PETROSINO, EDUARDO GONZALEZ, JR., JOSE BONILLA-REYES, VINCENT PEREZ, MARTIN GONZALEZ, CALVIN ADAMS, WILLIAM FRITZ, KATHERINE HALPERN, CHRISTIAN TEJADA, EDWARD STOKES, PLINIO MEDINA, TOWANA STARKS, LAWSON HOPKINS, RUBEN M. ALEMAN, EUGENE RYBACKI, EARL CROSS, MANOLO HIRALDO, ROBERT HAIRSTON,

*Plaintiffs*,

-v.-

JOHN CATSIMATIDIS,

                                        *Defendant-Appellant.*

GRISTEDE'S OPERATING CORP., GRISTEDE'S FOODS NY, INC., NAMDOR, INC., GRISTEDE'S FOODS, INC., CITY PRODUCE OPERATING CORP.,

                                        *Defendants-Counter-Claimants*,

GALLO BALSECA, JAMES MONOS,

                                        *Defendants.*[*]

_____

Before:
        WESLEY AND HALL, *Circuit Judges*, GOLDBERG, *Judge.*[**]

_____

A class of current and former employees of Gristede's supermarkets sued several corporate and individual defendants for alleged violations of the Fair Labor Standards Act and the New York Labor Law. The United States District Court for the Southern District of New York (Crotty, *J.*) granted partial summary judgment for the plaintiffs, concluding that John Catsimatidis, the owner, president, and CEO of Gristede's, was the plaintiffs' "employer" under both laws. Catsimatidis appeals, and we AFFIRM IN PART, VACATE IN PART, AND REMAND.

---

[*]The Clerk of Court is directed to amend the caption as listed above.

[**]The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

JONATHAN D. HACKER (Walter Dellinger, Brianne J. Gorod, Joanna Nairn, *on the brief*), O'Melveny & Myers LLP, Washington, D.C. *for Appellant*.

DEEPAK GUPTA, Gupta Beck PLLC, Washington, D.C. (Gregory A. Beck, Jonathan E. Taylor, Gupta Beck PLLC, Washington, D.C.; Adam T. Klein, Justin M. Swartz, Molly A. Brooks, Outten & Golden LLP, New York, NY, *on the brief*) *for Appellees*.

RACHEL GOLDBERG, Attorney, Office of the Solicitor (M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, *on the brief*), *for Amicus Curiae Secretary of Labor*.

Tsedeye Gebreselassie, Catherine K. Ruckelshaus, National Employment Law Project, New York, NY, *for Amicus Curiae Make The Road New York, Brandworkers International, Restaurant Opportunities Center New York, Chinese Staff and Workers Association, National Mobilization Against Sweatshops, National Employment Law Project, Legal Aid Society of New York, Urban Justice Center, Asian American Legal Defense and Education Fund*.

WESLEY, *Circuit Judge*.

After the failure of a settlement in a wage-and-hour case brought by a group of employees of Gristede's supermarkets, the plaintiff employees moved for partial summary judgment on the issue of whether John Catsimatidis, the chairman and CEO of Gristede's Foods, Inc., could be

3

held personally liable for damages. The case turns on whether Catsimatidis is an "employer" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d), and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190(3), 651(6). The United States District Court for the Southern District of New York (Crotty, *J.*) granted partial summary judgment for the plaintiffs on the issue, establishing that Catsimatidis would be held jointly and severally liable for damages along with the corporate defendants. *See Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316(PAC), 2011 WL 4571792 (S.D.N.Y. Sept. 9, 2011) ("*Torres III*"). Catsimatidis appeals. We affirm the district court's decision so far as it established that Catsimatidis was an "employer" under the FLSA; we vacate and remand the grant of partial summary judgment on plaintiffs' NYLL claims.

**Background**

Catsimatidis is the chairman, president, and CEO of Gristede's Foods, Inc., which operates between 30 and 35 stores in the New York City metro area and has approximately 1700 employees. Although a series of mergers and acquisitions has complicated the question of which companies are responsible for the Gristede's business and

4

supermarkets, the parties have not made corporate structure the focus of this case. They essentially agree that Catsimatidis is the owner and corporate head of all implicated companies, but they dispute the manner and degree of his control over the stores and employees.

In 2004, a group of then-current and former employees of Gristede's supermarkets sued several companies involved in operating the stores. The employees also sued three individual defendants: Catsimatidis, Gristede's District Manager James Monos, and Gristede's Vice President Gallo Balseca. The district court certified a class composed of "[a]ll persons employed by defendants as Department Managers or Co-Managers who were not paid proper overtime premium compensation for all hours that they worked in excess of forty in a workweek any time between April 30, 1998 and the date of final judgment in this matter (the 'class period')." *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316(PAC), 2006 WL 2819730, at *11 (S.D.N.Y. Sept. 29, 2006) ("*Torres I*") (quotation marks omitted). In this decision, the court noted that the parties disputed the duties of co-managers and department managers, though the scope of plaintiffs' duties are not at issue in this appeal.

5

After two-and-a-half years of litigation, the district court granted summary judgment for the plaintiffs on their FLSA and NYLL claims, which concerned reduction of hours, withholding of overtime, misclassification as exempt employees, and retaliation. *See Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 461-63, 475 (S.D.N.Y. 2008) ("*Torres II*"). The court held that plaintiffs were entitled to liquidated damages, the amount of which would be determined in future proceedings. *Id.* at 462 n.14, 465. Plaintiffs reserved the right to move separately for a determination that the individual defendants were individually liable as joint employers. *Id.* at 453 n.2.

Following the summary judgment order, the parties reached a settlement agreement, which the district court approved. The corporate defendants later defaulted on their payment obligations under the agreement. Defendants sought to modify the settlement, but the district court denied their request. Plaintiffs then moved for partial summary judgment on Catsimatidis's personal liability as an employer.

The district court granted the motion for reasons both stated on the record at the conclusion of oral argument on

6

the motion, *see* Special App'x at 43-46, and memorialized in a written decision, *see Torres III*. The reasons included the fact that Catsimatidis "hired managerial employees," "signed all paychecks to the class members," had the "power to close or sell Gristede's stores," and "routinely review[ed] financial reports, work[ed] at his office in Gristede's corporate office and generally preside[d] over the day to day operations of the company." *Torres III*, 2011 WL 4571792, at *2. According to the district court, "[f]or the purposes of applying the total circumstances test, it does not matter that Mr. Catsimatidis has delegated powers to others[; w]hat is critical is that Mr. Catsimatidis has those powers to delegate." *Id.* (citation omitted). The court concluded that "[t]here is no area of Gristede's which is not subject to [Catsimatidis's] control, whether [or not] he chooses to exercise it," and that, therefore, Catsimatidis "had operational control and, as such, [] may be held to be an employer." *Id.* at *3.[1]

---

[1] In its oral ruling and accompanying order, the district court granted summary judgment finding Catsimatidis individually liable as an "employer" under the NYLL, but the court did not explain its reasons beyond what might be inferred from its discussion setting forth its reasoning in the FLSA context. *See Torres III*, 2011 WL 4571792, at *1; Special App'x at 46-47.

**Discussion**[2]

**I.      Definition of "employer" under the FLSA**

The Supreme Court has recognized "that broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985). Accordingly, the Court "has consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction." *Id.* (quotation marks omitted). "The common law agency test was found too restrictive to encompass the broader definition of the employment relationship contained in the [FLSA]." *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993). Instead, the statute "defines the verb 'employ'

---

[2]"We review an award of summary judgment *de novo*, and we will uphold the judgment only if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment was warranted as a matter of law." *Barfield v. NYC Health & Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008) (citing Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "The nonmoving party must set forth specific facts showing that there is a genuine issue for trial, and this Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008) (internal quotation marks and citation omitted).

expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). Unfortunately, however, the statute's definition of "employer" relies on the very word it seeks to define: "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The statute nowhere defines "employer" in the first instance.

The Supreme Court noted early on that the FLSA contains "no definition that solves problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947). The Court has also observed "that the 'striking breadth' of the FLSA's definition of 'employ' 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles' in order to effectuate the remedial purposes of the act.'" *Barfield*, 537 F.3d at 141 (quoting *Darden*, 503 U.S. at 326) (internal citation omitted).

"Accordingly, the Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in

9

'economic reality rather than technical concepts.'" *Id.* (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The "economic reality" test applies equally to whether workers are employees and to whether managers or owners are employers. *See Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

"[T]he determination of the [employment] relationship does not depend on such isolated factors" as where work is done or how compensation is divided "but rather upon the circumstances of the whole activity." *Rutherford*, 331 U.S. at 730. Some early cases concerned managerial efforts to distance themselves from workers in an apparent effort to escape the FLSA's coverage. For example, in *Goldberg*, the Supreme Court considered whether a manufacturing cooperative was an "employer" of "homeworker" members who created knitted and embroidered goods in their homes and were paid by the month on a rate-per-dozen basis. 366 U.S. at 28-29. The Court concluded that this constituted an employer-employee relationship because management's authority made "the device of the cooperative too transparent to survive the statutory definition of 'employ' and the Regulations governing homework." *Id.* at 33. "In short, if the

'economic reality' rather than 'technical concepts' is to be the test of employment, these homeworkers are employees." *Id.* (internal citations omitted). Similarly, the Court noted in *Rutherford* that "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." 331 U.S. at 729.

The Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances"; we have "identified different sets of relevant factors based on the factual challenges posed by particular cases." *Barfield*, 537 F.3d at 141-42.

In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), we identified factors that are likely to be relevant to the question of whether a defendant is an "employer." In that case, prison inmates teaching classes in a program that was managed by a college claimed the college was their employer. The district court rejected this assertion because "the college had only qualified control over the inmate instructors; the Department of Correctional Services always maintained ultimate control."

11

*Barfield*, 537 F.3d at 142 (describing *Carter*) (quotation marks omitted). This Court, however, concluded that the "ultimate control" rule "would not comport with the 'remedial' purpose of the FLSA, which Congress intended to 'have the widest possible impact in the national economy.'" *Id*. (quoting *Carter*, 735 F.2d at 12). Instead, we established four factors to determine the "economic reality" of an employment relationship: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id*. (quoting *Carter*, 735 F.2d at 12).[3]

*Barfield* also discusses the factors this court has used "to distinguish between independent contractors and employees," 537 F.3d at 143 (citing *Brock v. Superior Care,*

---

[3] Although the *Carter* court did not ultimately conclude that the prisoners were employees of the college, it noted that the following facts about the college "may be sufficient to warrant FLSA coverage" and certainly presented issues of material fact on the subject: the college "made the initial proposal to 'employ' workers; suggested a wage as to which there was 'no legal impediment'; developed eligibility criteria; recommended several inmates for the tutoring positions; was not required to take any inmate it did not want; decided how many sessions, and for how long, an inmate would be permitted to tutor; and sent the compensation directly to the inmate's prison account." 735 F.2d at 15.

*Inc*., 840 F.2d 1054, 1058-59 (2d Cir. 1988)), and "to assess whether an entity that lacked formal control nevertheless exercised functional control over a worker," *id.* (citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003)).[3] None of the factors used in any of these cases, however, comprise a "rigid rule for the identification of an FLSA employer." *Id.* "To the contrary, . . . they provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give

---

[3] In *Zheng*, the court considered whether a garment manufacturer that contracted out the last phase of its production process to workers including the plaintiffs was an "employer" under the FLSA. It concluded that the relevant factors in such an instance were

> (1) whether [the manufacturer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the manufacturer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [manufacturer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the manufacturer].

*Zheng*, 355 F.3d at 72. These factors highlight the flexible and comprehensive nature of the economic realities test in determining when an entity is an "employer" (in this case, whether the manufacturer was a "joint employer" along with another corporation) but are not directly implicated here.

13

proper effect to the broad language of the FLSA." *Id.* (quoting *Zheng*, 355 F.3d at 75-76).

### a.    Individual liability

None of the cases above dealt specifically with the question we confront here: whether an individual within a company that undisputedly employs a worker is personally liable for damages as that worker's "employer." The only case from our Circuit to confront the question squarely is *RSR*, 172 F.3d 132. RSR provided guards, pre-employment screening, and other security services. It was sued for FLSA violations with regard to its security guards. Its chairman of the board, Portnoy, was found by the district court after a bench trial to be an "employer" under the statute. We affirmed, in a decision that both applied the four-factor test from *Carter* and noted other factors bearing upon the "overarching concern [of] whether the alleged employer possessed the power to control the workers in question." *Id.* at 139.

As background, we noted that "[a]lthough Portnoy exercised broad authority over RSR operations . . . , he was not directly involved in the daily supervision of the security guards." *Id.* at 136. Nonetheless, because "he was

14

the only principal who had bank credit, he exercised financial control over the company." *Id.* "Thus, he had authority over" the operations manager, who directly supervised the guards. *Id.* "Portnoy kept himself apprised of RSR operations by receiving periodic reports [including] work orders, memos, investigation reports, and invoices concerning the business operations, as well as weekly timesheets of [a manager's] duties." *Id.* at 137. He also "referred a few individuals to RSR as potential security guard employees," "assigned guards to cover specific clients, sometimes set the rates clients were charged for those services, gave [a manager] instructions about guard operations, and forwarded complaints about guards to" a manager. *Id.*

Portnoy also "signed payroll checks on at least three occasions" and "established a payment system by which clients who wanted undercover operatives would pay" Portnoy's separate labor-relations firm. *Id.* Additionally, Portnoy "represented himself to outside parties as" being "the 'boss' of RSR" by "allowing his name to be used in sales literature, by representing to potential clients that he was a principal with control over company operations . .

. and by giving [a manager] instructions with respect to [] clients' security needs." *Id.*

We determined that at least three of the four *Carter* factors applied. First, Portnoy had hired employees, and although this "involved mainly managerial staff, the fact that he hired individuals who were in charge of the guards [was] a strong indication of control." *Id.* at 140. Second, Portnoy had, "on occasion, supervised and controlled employee work schedules and the conditions of employment." *Id.* Third, he had "participate[d] in the method of pay[ing]" the guards, even though he was not involved in determining their salaries, because he had previously "ordered a stop to the illegal pay practice of including security guards on 1099 forms as independent contractors," and he "had the authority to sign paychecks throughout the relevant period." *Id.* Although there was no evidence that Portnoy had been involved in maintaining employment records, we confirmed that the fact that "this fourth factor is not met is not dispositive." *Id.* The "'economic reality' test encompasses the totality of circumstances, no one of which is exclusive." *Id.* at 139. In sum, we determined that Portnoy was "not only a 50 percent stockowner; he had direct

16

involvement with the security guard operations from time to time and was generally involved with all of RSR's operations." *Id.* at 141.

*RSR* also highlighted two legal questions relevant here. The first concerns the scope of an individual's authority or "operational control" over a company – at what level of a corporate hierarchy, and in what relationship with plaintiff employees, must an individual possess power in order to be covered by the FLSA? The second inquiry, related but distinct, concerns hypothetical versus actual power: to what extent and with what frequency must an individual actually use the power he or she possesses over employees to be considered an employer?

### i. Operational control

In addition to applying the *Carter* test, *RSR* noted the district court's recognition that Portnoy exercised direct authority over the two persons most responsible for managing the security guards, as well as the fact that "[b]ecause [Portnoy] controlled the company financially, it was no idle threat when he testified that he *could have* dissolved the company if [one of the managers] had not followed his directions." *Id.* at 140 (emphasis added). Accordingly, we

17

emphasized that we rejected Portnoy's argument "that evidence showing his authority over management, supervision, and oversight of RSR's affairs in general is irrelevant, and that only evidence indicating his direct control over the guards should be considered." *Id.* We concluded that this formulation "ignores the relevance of the totality of the circumstances in determining Portnoy's operational control of RSR's employment of the guards." *Id.* We also noted that "operational control" had been cited as relevant by other circuits considering the question of individual liability under the FLSA. *See id.*

"Operational control" is at the heart of this case. Catsimatidis's core argument is that he was a high-level employee who made symbolic or, at most, general corporate decisions that only affected the lives of the plaintiffs through an attenuated chain of but-for causation. Although Catsimatidis undisputedly possessed broad control over Gristede's corporate strategy, including the power to decide to take the company public, to open stores, and to carry certain types of merchandise, he contends that a FLSA "employer" must exercise decision-making in a "day-to-day" capacity. Appellant's Br. at 3. By this, he appears to

18

mean decisions about individual store-level operations, close to, if not actually including, the particular working conditions and compensation practices of the employees themselves. Plaintiffs counter that many cases have found individuals with "operational control" on a more general level to be employers. Appellees' Br. at 28-31.

Most circuits to confront this issue have acknowledged – and plaintiffs do not dispute – that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA "employer." Many cases rely on *Wirtz v. Pure Ice Co.*, 322 F.2d 259, 262 (8th Cir. 1963), for this proposition. In *Wirtz*, the court concluded that the individual defendant was not an employer even though he was the "controlling stockholder and dominating figure" because although he "could have taken over and supervised the relationship between the corporation and its employees had he decided to do so," he did not. *Id.* (quotation marks omitted). The defendant visited the facility at issue a few times per year but "had nothing to do with the hiring of the employees or fixing their wages or hours," and he "left the matter of compliance with the Fair Labor Standards Act up to

19

the various managers of the businesses in which he had an interest." *Id.* at 262-63. The court noted, however, that if it were to consider "a combination of stock ownership, management, direction and the right to hire and fire employees, then a contrary conclusion would be well supported." *Id.* at 263.

In *RSR*, we cited three cases with holdings in accordance with *Wirtz* in resolving the "operational control" issue. First, in *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194-95 (5th Cir. 1983), the Fifth Circuit determined that an individual without an interest in the employer corporation could be held liable if he "effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees" – or if he lacked that power but "independently exercised control over the work situation." The *Sabine* court found the individual defendant liable because he "indirectly controlled many matters traditionally handled by an employer in relation to an employee (such as payroll, insurance, and income tax matters)," noting also that the defendant's "financial gymnastics directly affected Sabine's employees by making it possible for Sabine to meet its

payroll and keep its employees supplied with the equipment and materials necessary to perform their jobs." *Id.* at 195. (quotation marks omitted).

Second, in *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991), the Sixth Circuit was unmoved by the protestations of an individual defendant who testified that he "made major corporate decisions" but "did not have day-to-day control of specific operations." The court found that the defendant's responsibilities, which included determining employee salaries, constituted "operational control of *significant aspects* of the corporation's day to day functions." *Id.* (quotation marks omitted) (emphasis in original).

Finally, in *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983), the First Circuit imposed liability on individual defendants "who together were President, Treasurer, Secretary and sole members of the Board" of the defendant company. One of the defendants had been "personally involved in decisions about layoffs and employee overtime hours," *id.*, and the defendants together had "operational control of significant aspects of the corporation's day to day functions, including compensation

21

of employees, and [] personally made decisions to continue operations despite financial adversity during the period of nonpayment," *id.* at 1514.

Plaintiffs in our case place particular emphasis on the statement by the *Agnew* court that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."[4]  *Id*. at 1511.  Although this appears to suggest that any amount of corporate control is sufficient to establish FLSA liability, the First Circuit warned against taking the FLSA's coverage too far, noting that "the Act's broadly inclusive definition of 'employer'" could, if "[t]aken literally and applied in this context[,] . . . make any supervisory employee, even those without any

---

[4] This language was cited by our Circuit in a case concerning the meaning of the word "employer" in the context of the Employee Retirement Income Security Act ("ERISA"), in which we noted that "[i]n FLSA cases, courts have consistently held that a corporate officer with operational control who is directly responsible for a failure to pay statutorily required wages is an 'employer' along with the corporation, jointly and severally liable for the shortfall." *Leddy v. Standard Drywall, Inc*., 875 F.2d 383, 387 (2d Cir. 1989) (citing *Agnew*, 712 F.2d at 1511). Because *Leddy* did not require or contain any actual analysis of the FLSA, however, this statement does not constitute a holding that liability on the basis of "operational control" requires an individual to have been directly responsible for FLSA violations.

22

control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees." *Id.* at 1513.

Drawing on this language, the First Circuit later concluded that individuals who had "exercised some degree of supervisory control over the workers" and been "responsible for overseeing various administrative aspects of the business" but had not demonstrated other important characteristics – "in particular, the personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act" – were not personally liable under the FLSA. *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998). The court rejected an "expansive application of the definition of an 'employer'" that would find that "the significant factor in the personal liability determination is simply the exercise of control by a corporate officer or corporate employee over the 'work situation.'" *Id.* at 679. No other decision has gone as far as *Baystate*; most courts have endeavored to strike a balance between upholding the broad remedial goals of the statute and ensuring that a liable individual has some relationship with plaintiff employees' work situation.

23

For example, in *Gray v. Powers*, 673 F.3d 352, 354-57 (5th Cir. 2012), the court found that the co-owner of a company that owned a nightclub was not a bartender's "employer" despite being a signatory on the corporate account and "occasionally sign[ing] several pages of pre-printed checks." The individual defendant had little control over the bar and its employees except to direct a bartender to serve certain customers on several occasions when he was at the bar. *Id.* at 354. Similarly, in *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986), the Eleventh Circuit held that an individual who was both president and vice president of a corporation, as well as a director and principal stockholder, was not an employer because he did not "have operational control of significant aspects of [the company's] day-to-day functions, including compensation of employees or other matters 'in relation to an employee.'"

By contrast, in *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993), the court found that a non-owner of a company that had invested in a nightclub had exercised sufficient "control over the work situation" as the "driving force" behind the company. The court cited evidence that the individual hired employees, gave them

24

instructions (including specific songs for dancers' routines), and signed their payroll checks. *Id.* He had also removed money from corporate safes, "ordered one employee to refrain from keeping records of the tip-outs," and "spoke[n] for [the company] during the Secretary's investigation of possible FLSA violations." *Id.*

These cases reaffirm the logic behind our holding in *RSR*, which focused on defendant Portnoy's "operational control *of RSR's employment of the guards*," *see RSR*, 172 F.3d at 140 (emphasis added), rather than simply operational control of the company. Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate "employer" status. Instead, to be an "employer," an individual defendant must possess control over a company's actual "operations" in a manner that relates to a plaintiff's employment. It is appropriate, as we implicitly recognized in *RSR*, to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation – even if this appears to establish a higher

25

threshold for individual liability than for corporate "employer" status.

The fundamental concern in the initial cases construing the FLSA was preventing a business entity from causing workers to engage in work without the protections of the statute. It was an "economic reality" that the "homework" cooperative in *Goldberg* functioned as the workers' employer because it paid them to create clothing, even if the compensation structure technically circumvented agency-law concepts of formal employment. *See Goldberg*, 366 U.S. at 31 (stating that the Court would be "remiss . . . if we construed the Act loosely so as to permit this homework to be done in ways not permissible under the Regulations"); *see also United States v. Rosenwasser*, 323 U.S. 360, 363 (1945) ("A worker is as much an employee when paid by the piece as he is when paid by the hour."). This concern is not as pressing when considering the liability for damages of an individual within a company that itself is undisputedly the plaintiffs' employer.

Even in the individual-liability context, however, "the remedial nature of the [FLSA] . . . warrants an expansive interpretation of its provisions so that they will have 'the

26

widest possible impact in the national economy.'" *RSR*, 172 F.3d at 139 (quoting *Carter*, 735 F.2d at 12). Nothing in *RSR*, or in the FLSA itself, requires an individual to have been personally complicit in FLSA violations; the broad remedial purposes behind the statute counsel against such a requirement. The statute provides an empty guarantee absent a financial incentive for individuals with control, even in the form of delegated authority, to comply with the law, and courts have continually emphasized the extraordinarily generous interpretation the statute is to be given. Nor is "only evidence indicating [an individual's] direct control over the [plaintiff employees] [to] be considered." *RSR*, 172 F.3d at 140. Instead, "evidence showing [an individual's] authority over management, supervision, and oversight of [a company's] affairs in general" is relevant to "the totality of the circumstances in determining [the individual's] operational control of [the company's] employment of [the plaintiff employees]." *Id.*

A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment. Although this does not mean that the

27

individual "employer" must be responsible for managing plaintiff employees – or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules – the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation.  Although the answer in any particular case will depend, of course, on the totality of the circumstances, the analyses in the cases discussed above, as well as the responsibilities enumerated in the *Carter* factors, provide guidance for courts determining when an individual's actions rise to this level.

### ii.    Potential power

In *RSR*, we noted that "operational control" need not be exercised constantly for an individual to be liable under the FLSA:

> [Employer] status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees.  Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence.

172 F.3d at 139 (quotation marks and alteration omitted).

The district court in this case appears to have relied on this language in stating that "[w]hat is critical is that Mr. Catsimatidis has [certain] powers to delegate" and that "[t]here is no area of Gristede's which is not subject to his control, whether [or not] he chooses to exercise it." *Torres III*, 2011 WL 4571792 at *2-3. The parties also dispute the importance of evidence indicating that Catsimatidis only rarely exercised much of the power he possessed.

Employer power that is "restricted or exercised only occasionally" does not mean "never exercised." In *Donovan v. Janitorial Services, Inc.*, 672 F.2d 528, 531 (5th Cir. 1982), the Fifth Circuit noted that the company owner's "considerable investment in the company gives him ultimate, if latent, authority over its affairs," and the fact that he had "exercised that authority only occasionally, through firing one employee, reprimanding others, and engaging in some direct supervision of Johnson Disposal drivers, does not diminish the significance of its existence." In *Superior Care*, this court noted that although representatives of the defendant business, a nurse-staffing company, visited job sites only infrequently, the company

29

had "unequivocally expressed the right to supervise the nurses' work, and the nurses were well aware that they were subject to such checks as well as to regular review of their nursing notes." 840 F.2d at 1060. "An employer does not need to look over his workers' shoulders every day in order to exercise control." *Id.* Similarly, in *Carter*, we rejected the proposition that the community college was not employing prison inmates solely because the prison had "ultimate control" over the prisoners, reasoning that the community college also made decisions that affected the prisoners' work. 735 F.2d at 13-14.

The Eleventh Circuit has squarely held that even when a defendant "could have played a greater role in the day-to-day operations of the [] facility if he had desired, . . . unexercised authority is insufficient to establish liability as an employer." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1161 (11th Cir. 2008). The *Alvarez* court found that an officer in a company that owned a kennel club was not an employer, in part because even though he might have had the authority to do so, he "had not taken part in the day-to-day operations of the facility, had not been involved in the supervision or hiring and firing of employees, and had not determined their compensation." *Id.*

30

Unlike *Alvarez*, *RSR* does not state unambiguously that unexercised authority is insufficient to establish FLSA liability, and we see no need to do so here in light of the evidence of the authority that Catsimatidis *did* exercise. Nonetheless, all of the cases discussed indicate that the manifestation of, or, at the least, a clear delineation of an individual's power over employees is an important and telling factor in the "economic reality" test. Ownership, or a stake in a company, is insufficient to establish that an individual is an "employer" without some involvement in the company's employment of the employees.

**II.    Catsimatidis as "employer"**

"Using this 'economic reality' test, we must decide whether [Catsimatidis] is an employer under the FLSA." *See RSR*, 172 F.3d at 140. Is there "evidence showing his authority over management, supervision, and oversight of [Gristede's] affairs in general," *see id.*, as well as evidence under the *Carter* framework or any other factors that reflect Catsimatidis's exercise of direct control over the plaintiff employees?

31

### a. Catsimatidis's overall authority

Catsimatidis is the chairman, president, and CEO of Gristede's Foods, Inc. Joint App'x 1016.[5] He does not report to anyone else at Gristede's. *Id.* at 1794. Catsimatidis personally owns the building in which Gristede's headquarters is located. *Id.* at 1789-90. His office is in that building, shared with Charles Criscuolo, Gristede's COO. *Id.* at 1793-94. Catsimatidis was "usually there for part of the day, at least [four] days a week." *Id.* at 1334. The human resources and payroll department is located in the same building. *Id.* at 1794-5. Regarding his duties, Catsimatidis testified: "I do the banking. I do the real estate. I do the financial. . . . I come up with concepts for merchandising. . . . I'm there every day if there is a problem," including problems with buildings, problems with the "Department of Consumer Affairs, governmental relations," and "[p]roblems with vendors, relationships with vendors, it takes up most of the time." *Id.* at 1800-01.

---

[5]Although Catsimatidis's and other employees' functions within Gristede's appear to have shifted during the lengthy pendency of this lawsuit, all references are to the period relevant to the case.

A series of subordinate managers reported to Catsimatidis but did not appear to have an extensive amount of interaction with him. Catsimatidis spoke to Criscuolo every day because they shared an office. *Id.* at 1797. Catsimatidis testifed that Vice President Gallo Balseca "runs operations" and was "in the stores every day," and that the district managers reported to Balseca. *Id.* at 1796. Balseca reported to Criscuolo, but Catsimatidis rarely spoke directly to Balseca. *Id.* at 1794, 1797. Catsimatidis testified that the company's director of security "reports to the chief operating officer on a day-to-day basis, but if there is something he thinks I should know about, he would call and tell me." *Id.* at 1809. Catsimatidis occasionally sat in on merchandising and operations meetings. *Id.* at 1799.

Catsimatidis stayed apprised of how Gristede's was doing, reviewing the overall profit and loss statements as well as the "sales to purchases" statements of particular stores. He received "weekly gross margin reports from all the perishable departments" and "a comprehensive P[rofit] and L[oss] report on a quarterly basis" that he studied in depth and sometimes used to make general recommendations.

33

*Id.* at 1849.  As Executive Director of Human Resources and Asset Protection Renee Flores stated, "if there is a store that buys more than they sell, and it's a consistent thing, he may say, 'You know what, you might want to take a look at that, because they're buying more than they're selling.'" *Id.* at 1450-51.

Catsimatidis testified that he made "big picture" "merchandising decisions, like do we, for the next six months, push Coca-Cola or push Pepsi-Cola?" and "the decisions on having pharmacies in the stores."  *Id.* at 1815. He testified that after making this sort of decision, he would tell Criscuolo or "yell it out when they have the [merchandising meeting]" in their shared office.  *Id.* at 1816.  He might also "yell out to go out and do more sales." *Id.* at 1817.

In general, employees agreed, as Executive Vice President Robert Zorn testified, that Catsimatidis "has whatever privileges an owner of a company has" to "make ultimate decisions as to how the company is run," and that there was "no reason to believe that if he chose to make a decision anybody there has the power to override him." *Id.* at 1329.  They also agreed that Catsimatidis has the

34

power to "shut down a store" or "sell a store if he felt that was the appropriate thing to do."  *Id.* at 1370.[6]

### b.    Involvement with stores

Although Catsimatidis did not exercise managerial control in stores on the day-to-day level of a manager, the evidence demonstrates that he exercised influence in specific stores on multiple occasions.  For example, he made suggestions regarding how products are displayed in stores. In general, he testified that he focused on "driv[ing] sales, driv[ing] product, get[ting] more sales out of the stores" through techniques such as "buying a Coca-Cola at [the] right price, and [] put[ting] it on a front end display at the right price."  *Id.* at 1819.

---

[6]At oral argument and in its written decision, the district court placed substantial reliance on an affidavit that Catsimatidis submitted in a separate lawsuit, a trademark action brought by Trader Joe's Company after it found out about a Gristede's plan to re-open a former Gristede's store under the name "Gristede's Trader John's."  The district court emphasized that the affidavit, which discussed the process by which Catsimatidis had come up with the idea, indicated that Catsimatidis has the power to "set prices for goods offered for sale," "select the decor for the stores," and "control any store's signage and advertising."  *Torres III*, 2011 WL 4571792, at *1.  Although the parties dispute the significance and admissibility of the affidavit, it is not necessary to our decision.  The affidavit indicates that Catsimatidis had the power to open a new store that was generally intended to offer "items at prices materially lower than comparable items in our other Gristede[']s stores."  Joint App'x 3752.  This only underscores the implication of the evidence we have already discussed: that Catsimatidis possessed the ability to control Gristede's operations at a high level.

Catsimatidis testified specifically that "when [he] used to go around the stores, [he] used to make comments to the store managers about displays," telling them, for example, "if you put up this product, you might sell $100 a week." *Id.* at 1828. He would make visits to "five or ten" stores on Saturday mornings, staying about ten minutes in each one. *Id.* He referred to these as "just [] goodwill visit[s], merchandising, sales, what are we doing right, what are we doing wrong, what can we do better." *Id.* at 1831-32. His deposition also contained the following exchange:

Q: Why did you want to visit every store?

A: To check the merchandising.

Q: Can't the store managers take care of that themselves?

A: If the store managers did it perfectly, then I wouldn't have to visit the stores.

Q: But you have a level of trust in the store managers, right?

A: You hope so, yes.

Q: Why do you think it was necessary for the president of the company to go around to all these stores?

A: For the same reason Sam Walton went and visited his stores.

Q: What reason is that?

A: You just get a better feeling for merchandising. Sam Walton was a great merchandiser.

Q: On the Saturday morning visits to the stores, what did you do?

A: I walked in, introduced myself to the manager, most of them I knew, and just we would talk about merchandising.  I would say is this selling, is this not selling, are you missing any products that you think you should have?  And I would – I felt I would get input from store managers on merchandising problems.

*Id.* at 1829-30.

Catsimatidis would also address problems that occurred in individual stores.  For example, he testified that if a vendor called him and said there was a problem, "[m]aybe that he was supposed to have a display and not have a display," he would not get involved personally but would refer the issue to Criscuolo.  *Id.* at 1827.  Catsimatidis testified that "if a store didn't look clean, or if it was very cluttered, [he] would make the comment about it . . . to the store manager, and then follow up and say it to [Criscuolo]."  *Id.* at 1831.  On one occasion, he went to a store and was "annoyed" that a type of fish he tried to buy was not in stock, so he "sent an e-mail to the meat director, copy to his boss, . . . sent one to the store manager, and sent one to the district manager."  *Id.* at

1882. Catsimatidis commented that the emails were his attempt to "bring[] it to their attention that the department looked bad" and that he "would hope the supervisor or the merchandisers would fix it." *Id.* at 1883.

Additionally, Catsimatidis testified that the company's system automatically forwards him copies of any consumer complaints, which he then forwards by email "to the responsible parties . . . with a comment of 'What the hell is happening?'" *Id.* at 1821. For example, he might forward a complaint about a store being dirty, and he sent a complaint about lids not fitting coffee cups to the deli director. *Id.* He testified, "I figured if they think I know about the problem, they'll work harder towards fixing it." *Id.* at 1822. When asked why this was, he said, "I guess they want to keep the boss happy, and I want to keep the consumers happy," and that "one of my jobs is how to get the consumers in our stores, and how to keep them in our stores." *Id.* at 1823. He has directed similar complaints to store managers. *Id.* at 1825.

Mitchell Moore, a former store manager, testified that Catsimatidis asked him to get involved with a "reset" at a particular store, meaning an effort to "change the store

38

around, move items around the store, allocation, bring in new items." *Id.* at 1418. Moore also testified that Catsimatidis, while walking through a store, might "want me to change a display around or to make it fuller or to put a different variety in there," or to "put signs on certain items, give them a good deal on it" if he wanted Moore to "push a particular item." *Id.* at 1421-22. Zorn said that he had seen Catsimatidis go to stores for grand openings or reopenings, "walk up and down the aisles . . . ask[] questions about – you know, he sees a product that is new and asks, you know – you know, who we buy that from and, you know, comments on the store decor," although Zorn noted that Catsimatidis was "there more in a PR capacity than a management type capacity." *Id.* at 1352-53.

c.   **The *Carter* factors**

The first element of the *Carter* test considers whether the individual defendant "had the power to hire and fire employees." *Barfield*, 537 F.3d at 142 (quotation marks omitted). The evidence demonstrates that Catsimatidis possesses, but rarely exercises, the power to hire or fire anyone he chooses. He testified, "I guess I can fire the people that directly report to me," which he said would

39

include "only maybe four or five" employees such as the COO and CFO. Joint App'x 1863. He testified in 2005 that he could not remember having fired anyone in five or six years. *Id.* at 1862. In *RSR*, we emphasized that the hiring and firing of "individuals who were in charge of [the plaintiff employees] is a strong indication of control." *RSR*, 172 F.3d at 140.

Zorn testified that Catsimatidis had hired him and "obviously would" have the authority to hire and fire others, "but he doesn't get involved in that." Joint App'x 1338. For example, when Zorn was "involved in letting go long-time employees for various reasons," he let Catsimatidis know "as a courtesy" and fired the employees even if Catsimatidis "wasn't happy about it." *Id.* at 1343. On one occasion when both Zorn and Catsimatidis interviewed a potential manager, Catsimatidis "was in favor of it but he left the decision to" Zorn. *Id.* at 1342. Catsimatidis promoted Deborah Clusan from director of payroll to director of payroll and human resources. *Id.* at 476. He promoted Moore to store manager from night manager. Moore testified that Catsimatidis "came to speak with me, asked me what my background was, . . . and then the next day the vice

40

president called me, and told me that I would be starting in the Store 504 the next day." *Id.* at 1412, 1415. Moore, like other employees, indicated that he "view[ed] Mr. Catsimatidis as [his] boss" and that Catsimatidis would have the power to fire a store employee. *Id.* at 1425-26.

The second *Carter* factor asks whether the individual defendant "supervised and controlled employee work schedules or conditions of employment." *Barfield*, 537 F.3d at 142 (quotation marks omitted). Plaintiffs overstate the importance of the two pieces of evidence on which they rely for this factor. Although they state in their brief that Catsimatidis said he "has handled complaints from Gristede's workers' union representatives 'every week for as long as I could remember,'" Appellees' Br. at 39, this mischaracterizes Catsimatidis's testimony; he stated that he had not been personally involved in union negotiations or discussions of problems, *see* Joint App'x 1802-03, 1812, 1876. Plaintiffs also assert that Catsimatidis "authorized an application for wage subsidies and tax credits on behalf of Gristede's employees." Appellees' Br. at 39. The evidence reflects only that Catsimatidis signed the application for tax credits to which Gristede's was entitled

41

for employing people "coming off of Social Services, off of welfare." Joint App'x at 482-83. Moreover, plaintiffs do not indicate how this affected their "work schedules or conditions of employment." Although Catsimatidis's involvement in the company and the stores as discussed above demonstrates some exercise of operational control, it does not appear to relate closely to this factor of the *Carter* test.

The third factor asks whether the individual defendant "determined the rate and method of payment." *Barfield*, 537 F.3d at 142 (quotation marks omitted). The district court and plaintiffs emphasize the fact that Catsimatidis's electronic signature appears on paychecks. This – like all factors – is not dispositive. *See Gray*, 673 F.3d at 354. Nonetheless, we held in *RSR* that "[t]he key question is whether [the defendant] had the authority to sign paychecks throughout the relevant period, and he did." *RSR*, 172 F.3d at 140.

*RSR* also focused on the fact that the defendant "controlled the company financially." *Id.* It is clear that Catsimatidis possessed a similar degree of control. He testified that he keeps track of "payroll" as "a line item

42

on accounting" and "a part of profit and loss," to know what percentage of Gristede's sales and expenses payroll comprises, but he does not get involved with individual salaries or schedules. Joint App'x at 1834-35. Although he did not speak to his managers "about people getting paid," *id.* at 1834, he knew that employees were paid on time "[b]ecause the unions would have come down on us real hard" if there was a problem. *Id.* at 1852. Catsimatidis explained that he might also learn about a problem "[i]f I walked down the aisle, and the employee saw me, they might complain," although the official procedure for such complaints involved the employees' union and store manager. *Id.* at 1866-67. Catsimatidis set up a meeting between lower-level managers and an outside payroll company, *id.* at 1452-53, and although he did not know specifically "if George Santiago in the store got a paycheck that week," his "rules are if somebody works, they get paid," *id.* at 469. The district court also noted that Catsimatidis stated "in open Court in this proceeding that he could shut down the business, declare bankruptcy, as well as provide the personal signature necessary for a bank letter of credit to be issued in favor of Gristede's," *Torres III*, 2011 WL

43

4571792, at *1, which further demonstrates the kind of financial control emphasized in *RSR*.

The fourth *Carter* factor asks whether the individual defendant "maintained employment records." *Barfield*, 537 F.3d at 142 (quotation marks omitted). Plaintiffs offer only that "Catsimatidis works in the same office where employment records are kept" and promoted the payroll director, Appellees' Br. at 41, essentially admitting that Catsimatidis did not meet this factor. In sum, the evidence – much of it Catsimatidis's own testimony – indicates that Catsimatidis meets the first and third *Carter* factors.

**d.   Totality of the circumstances**

There is no question that Gristede's was the plaintiffs' employer, and no question that Catsimatidis had functional control over the enterprise as a whole. His involvement in the company's daily operations merits far more than the symbolic or ceremonial characterization he urges us to apply. Unlike the defendant in *Wirtz*, who visited his company's facilities only a few times a year, Catsimatidis was active in running Gristede's, including contact with individual stores, employees, vendors, and customers. Catsimatidis dealt with customer complaints, in-

44

store displays and merchandising, and the promotion of store personnel. That he may have done so "only occasionally" does not mean that these actions are irrelevant, *see RSR*, 172 F.3d at 139, especially when considered in the context of his overall control of the company.

Although there is no evidence that he was responsible for the FLSA violations – or that he ever directly managed or otherwise interacted with the plaintiffs in this case – Catsimatidis satisfied two of the *Carter* factors in ways that we particularly emphasized in *RSR*: the hiring of managerial employees, and overall financial control of the company. *See id.* at 136-37, 140 (finding that the individual defendant "exercised financial control over the company" and "frequently" gave instructions to subordinate managers); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (noting that the individual defendant was the "'top man'" in a hotel company who "held [the hotels'] purse-strings and guided their policies" and that the hotels "speaking pragmatically, . . . functioned for the profit of his family"). This involvement meant that Catsimatidis possessed, and exercised, "operational control" over the plaintiffs' employment in much more than a "but-

45

for" sense. His decisions affected not only Gristede's bottom line but individual stores, and the personnel and products therein.

We recognize that the facts here make for a close case, but we are guided by the principles behind the liquidated damages provision of the FLSA in resolving the impact of the totality of the circumstances described herein. The Supreme Court has noted that "liquidated damages as authorized by the FLSA are not penalties but rather compensatory damages 'for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" *Republic Franklin Ins. Co. v. Albemarle County Sch. Bd.*, 670 F.3d 563, 568 (4th Cir. 2012) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)); *see also Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982) (noting that liquidated damages "are compensatory, not punitive in nature").

As counsel for *amicus curiae* the Secretary of Labor explained at oral argument, the purpose of the FLSA is not to punish an employer but to remunerate aggrieved employees. Considered in the context of the expansive interpretation that courts have afforded the statute, this policy reasoning

46

particularly counsels in favor of finding that Catsimatidis was an "employer" given the failure of the settlement between the corporate defendants and the plaintiff employees. Catsimatidis was not personally responsible for the FLSA violations that led to this lawsuit, but he nonetheless profited from them. And although the Gristede's Supermarkets business entity appears to have been larger than other businesses discussed in the cases that have considered this question, the company was not so large as to render Catsimatidis's involvement a legal fiction. The company is not public. Its stores, in which Catsimatidis actively exercised his influence, are all in the New York City metropolitan area, as are the company headquarters, where he worked almost daily. In sum, as the district court concluded, "it is pellucidly clear that he is the one person who is in charge of the corporate defendant."[7] *Torres III*, 2011 WL 4571792, at *3.

---

[7]The district court's decision indirectly referenced statements made by Catsimatidis in open court at a hearing on the settlement agreement to the effect that he was "here to speak for 1,700 employees that [sic] their jobs . . . on the line," that he "represent[ed] the 1,700 current employees," and that he was "their employer." Joint App'x 3594-95. We do not, of course, afford these statements weight as legal conclusions, but they are telling.

47

Although we must be mindful, when considering an individual defendant, to ascertain that the individual was engaged in the culpable company's affairs to a degree that it is logical to find him liable to plaintiff employees, we conclude that this standard has been met here. Catsimatidis's actions and responsibilities – particularly as demonstrated by his active exercise of overall control over the company, his ultimate responsibility for the plaintiffs' wages, his supervision of managerial employees, and his actions in individual stores – demonstrate that he was an "employer" for purposes of the FLSA.

**III.     New York Labor Law**

The NYLL defines "employer" as "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer."  N.Y. Lab. Law. §§ 190(3), 651(6).  The definition of "employed" under the NYLL is that a person is "permitted or suffered to work."  *Id*. § 2(7).

The district court granted partial summary judgment in plaintiffs' favor on their NYLL claims, but neither its oral nor its written decision contained any substantive discussion of the issue.  Plaintiffs assert that the tests

for "employer" status are the same under the FLSA and the NYLL, but this question has not been answered by the New York Court of Appeals. Defendants respond that corporate officers cannot be held liable under the NYLL simply by virtue of their status, but plaintiffs are arguing that Catsimatidis should be held liable "not as [a] corporate officer[] or shareholder[], but as [an] employer[]." *See Chu Chung v. New Silver Palace Rest., Inc.*, 272 F. Supp. 2d 314, 318 (S.D.N.Y. 2003).

Plaintiffs also contend in their response brief that "there is no need to also establish [Catsimatidis's] status as an employer under state law" because the settlement agreement establishes that he will be personally liable "'if the Court holds John Catsimatidis to be an employer'–period." Appellees' Br. at 41-42 (quoting Settlement Agreement § 3.1(H)). Defendants do not respond to this in their reply brief.

In light of the possible disagreement between the parties regarding the need for us to decide this issue of state law, and particularly in light of the absence of discussion of the issue in the district court's decision, we vacate the grant of summary judgment in plaintiffs' favor on

the NYLL claims and remand to the district court.  The case will return to the lower court in any event for a determination of damages in light of our holding today; in the process, the parties and the district court may determine (1) whether the NYLL question requires resolution, and (2) what that resolution should be.

## Conclusion

We have examined all of Catsimatidis's arguments on appeal and find them to be without merit.  For the foregoing reasons, the judgment of the district court granting partial summary judgment in favor of plaintiffs is **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**