# United States Court of Appeals
## For the First Circuit

---

Nos. 12-1573, 12-1653

ELIZABETH MANNING ET AL.,

Plaintiffs, Appellants,

v.

BOSTON MEDICAL CENTER CORPORATION;
ELAINE ULLIAN; JAMES CANAVAN,

Defendants, Appellees,

BOSTON REGIONAL MEDICAL CENTER, INC.; BOSTON REGIONAL MEDICAL
CENTER, LLC; BOSTON MEDICAL CENTER 403B RETIREMENT PLAN,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Thompson, Stahl, and Lipez,
Circuit Judges.

---

Guy A. Talia, with whom Patrick J. Solomon and Thomas &
Solomon LLP were on brief, for appellants.
C.J. Eaton, with whom Richard L. Alfred, Kristin G. McGurn,
Jessica M. Schauer, and Seyfarth Shaw LLP were on brief, for
appellees.

---

August 1, 2013

---

**LIPEZ, Circuit Judge**. Plaintiffs Elizabeth Manning, Lisa Rivers, Rhonda Williams, and Reva McCarthy bring this wage-and-hour action against defendants Boston Medical Center Corporation ("BMC"), Elaine Ullian, and James Canavan. Current and former BMC employees, plaintiffs allege that defendants deprived them of their wages through the use of timekeeping policies and employment practices that required them to work through their meal and rest periods, put in extra work time before and after their regularly scheduled work shifts, and attend mandatory training sessions. The complaint asserts causes of action under the Fair Labor Standards Act ("FLSA") and Massachusetts common law for recovery of their unpaid wages. Plaintiffs also seek certification of a collective action pursuant to FLSA § 16(b), 29 U.S.C. § 216(b), and a class action pursuant to Federal Rule of Civil Procedure 23.

This case began as two separate actions, one in federal court raising FLSA claims, and another in the Massachusetts Commonwealth court raising state law claims. Defendants removed the latter action to federal court. After the two cases were joined via the filing of a single amended complaint, defendants moved to dismiss all of the claims, both federal and state, and sought to strike the class and collective action allegations. The district court granted defendants' motion in its entirety, and plaintiffs now appeal.

We have seen this case before, albeit with different parties. As explained in our prior opinions, see Pruell v. Caritas Christi, 678 F.3d 10 (1st Cir. 2012); Cavallaro v. UMass Memorial Healthcare, Inc., 678 F.3d 1 (1st Cir. 2012), numerous lawsuits of this kind have been filed against hospitals across the country, all alleging similar forms of systematic undercompensation. These cases, which we have previously dubbed "hospital compensation cases," assert "that [defendants] require[] unpaid work through meal-breaks due to an automatic timekeeping deduction, unpaid preliminary and postliminary work, and unpaid training sessions." Pruell, 678 F.3d at 13-14. A number of these actions are being litigated by counsel for plaintiffs in this case. See id. at 11; Cavallaro, 678 F.3d at 2.

After careful consideration of the numerous arguments raised on appeal, we vacate the district court's dismissal of the FLSA claims against BMC and Ullian, as well as the Massachusetts common law claims for breach of contract, promissory estoppel, money had and received, unjust enrichment, and conversion. We also vacate the striking of plaintiffs' class and collective allegations. We affirm the district court's directive that the plaintiffs in the two cases file a single consolidated complaint and, by extension, the district court's assumption of jurisdiction over the state law claims. We also affirm the dismissal of the FLSA claims against Canavan, the fraud and negligent

-3-

misrepresentation claims, and the denial of further leave to amend the complaint.

**I.**

## A.  Factual Background

BMC refers to a group of related organizations that operate a set of healthcare facilities in the Boston area.  The two individual defendants are Elaine Ullian, BMC's former president and chief executive officer, and James Canavan, BMC's former senior human resources director.  Plaintiffs are three registered nurses (Manning, Rivers, and Williams) and one administrative assistant (McCarthy) who worked or currently work for BMC at several of its locations.  They seek to represent a group of over 4,000 people who were or are currently employed by BMC as hourly workers.  This group includes individuals in a broad range of positions, from nurses, medical assistants, technicians, and physical therapists, to administrative staff, custodians, and home health aides.

The crux of plaintiffs' claims is that defendants denied BMC's workers full compensation for their work through a combination of unlawful pay practices and timekeeping policies.  The complaint alleges that BMC employees are not properly compensated for time spent performing work during their regularly scheduled meal breaks, as well as time spent before and after their scheduled shifts.  The work that employees perform during their meal breaks and before and after their shifts includes tending to

-4-

patients, doing paperwork, preparing charts, and responding to phone calls. Employees are often not relieved by other employees when the time comes for their meal breaks, forcing them to work during times when they are ostensibly not supposed to be working.

The complaint suggests that BMC consciously takes advantage of its employees' dedication and commitment to their patients, knowing that they would not abandon their caregiving responsibilities simply because their work hours are over or because they are due to take a meal or rest break.[1]

A key aspect of plaintiffs' claims is the interaction of BMC's alleged policies and practices with the company's timekeeping system. BMC maintains time records using an automated system that is programmed to deduct time from the employees' paychecks for meals, breaks, or other noncompensable time. Despite the fact that plaintiffs spend much of this time performing regular work responsibilities, the deductions for their meal break time are automatic. Plaintiffs also allege that they are "not allowed to

---

[1] Attached to the complaint is an article from The New York Times describing some of the hospital compensation cases. This article quotes a registered nurse who worked for a hospital in Pennsylvania:

'Most nurses put the patient first . . . . We often gave up lunch breaks to see that a patient was taken care of properly. . . . If you brought your lunch from home or got food in the cafeteria and took it to the nursing unit, you would be interrupted by phone calls, by physicians and family members who wanted to talk to you. We really did not have an uninterrupted meal break.'

record all their work performed" before and after their shifts, and, even when they are permitted to record that time, they are not compensated "properly."

Additionally, BMC employees are not paid for time spent during required training sessions. These trainings take place during regular work hours and cover subjects directly related to employees' work responsibilities, including new areas of medical research and procedure as well as instruction on basic protocols such as administering cardiopulmonary resuscitation ("CPR").

The complaint further states that BMC and the employees' supervisors are well aware that employees are performing work without being paid. Employees are often asked to take on responsibilities during their meal breaks and before and after their work shifts. The work is performed on BMC's premises during operational hours, "in full view of the defendants' managers and supervisors." Plaintiffs also allege that due to staffing shortages and other industry demands, BMC's management knows that the tasks they assign require their employees to work through their meal breaks and before and after their regularly scheduled shifts.

## B. Procedural History

As noted, this case began as two separate actions, one initiated in the District of Massachusetts and the other in the Commonwealth courts. We recount their respective paths to this court.

-6-

## 1.  The Initiation of the Two Actions

Three of the named plaintiffs, Manning, Rivers, and Williams, filed an action in federal court in September 2009 ("Manning I"), alleging claims under the FLSA and other federal statutes.[2]  Defendants moved to dismiss all of those claims under Federal Rule of Civil Procedure 12(b)(6).  As to the FLSA claim specifically, the motion challenged the sufficiency of the complaint's factual allegations and also contended that because the then-existing plaintiffs were all union members, the claim was precluded by the operation of federal labor laws governing the union-employer relationship, including the National Labor Relations Act ("NLRA").

Also in September 2009, Manning, Rivers, and Williams initiated a parallel action in the Massachusetts Commonwealth courts ("Manning II").  This complaint pled a number of Massachusetts statutory and common law claims, relying on the same facts as the federal case.  Defendants removed the case to federal court, contending that all of plaintiffs' claims were completely preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), because plaintiffs were union workers covered by a collective bargaining agreement ("CBA") and their causes of action were founded directly on or necessarily required the

---

[2] Of the federal claims, only the dismissal of the FLSA claim is before us on appeal.

interpretation of the CBA.  Defendants then requested consolidation of Manning I and Manning II under Federal Rule of Civil Procedure 42, and also filed a motion to dismiss the Manning II complaint for failure to state a claim.  Plaintiffs, for their part, sought to remand Manning II as improperly removed.

On September 16, 2010, the district court held a hearing on all of the pending motions in Manning I and Manning II.  The court then took the motions under submission and stated that it would defer ruling on defendants' motion to consolidate the two actions until it resolved the motions to dismiss, as the dismissal of the complaints would moot the consolidation request.

In February 2011, the court granted the motion to dismiss the Manning I complaint, ruling that the facts alleged were insufficient to state a plausible claim for relief under the FLSA. The district court stated that the "complaint runs to 25 pages and 158 paragraphs, yet it lacks even the most basic information about [plaintiffs'] claims."  The court observed that among other deficiencies, the complaint did not identify the defendants for whom the plaintiffs worked, the plaintiffs' jobs and occupations, or the amounts of unpaid wages.  The court dismissed the FLSA claim without prejudice and gave plaintiffs leave to amend to correct the identified deficiencies.

In March 2011, the district court ruled on the motions pending in Manning II.  The court denied plaintiffs' remand motion,

holding that LMRA complete preemption applied to plaintiffs' Massachusetts claims, thus converting them into federal causes of action and rendering the case properly removed. The court also granted defendants' motion to dismiss the Manning II complaint, referring to its order dismissing the Manning I complaint and similarly ruling that the common law claims were insufficiently pled. The court also observed that BMC's status as a public charity rendered it statutorily exempt from plaintiffs' Massachusetts wage-and-hour claims and dismissed them as well. Plaintiffs were given leave to amend their complaint to plead a "recharacterized § 301 count" in Manning II.

## 2. Subsequent Proceedings and the Order Dismissing the Amended Complaint

Anticipating the filing of amended complaints, the court held a joint scheduling conference on April 14, 2011, for Manning I and Manning II. Although we have not been provided with a transcript of this hearing, the parties agree that the court directed plaintiffs to file a single complaint containing both their FLSA and state law claims.[3] Plaintiffs responded by filing

---

[3] The district court's order dismissing plaintiffs' amended complaint suggests otherwise, given the observation that its order in Manning II directed plaintiffs to file a cause of action under the LMRA in that case. The court's formal orders on the motions in Manning I and Manning II do not expressly direct the plaintiffs to file a single consolidated complaint.

We note, however, that the district court's docket in Manning I contains an entry dated 4/14/2011, which includes the clerk's note regarding the joint hearing. This entry states, with emphasis added: "Amended Pleadings due by 4/29/2011[] (1 complaint)." The

an amended complaint in Manning I only. This complaint alleged a cause of action under the FLSA, brought on behalf of all plaintiffs against all defendants, as well as a number of contract, fraud, and tort claims pursuant to Massachusetts law brought only on behalf of BMC employees not covered by a CBA. The complaint added McCarthy, a nonunion employee, as a plaintiff in order to represent the nonunionized BMC workers in the putative class. Plaintiffs also moved for conditional certification and expedited notice under the FLSA's collective action provisions. Defendants, for their part, moved to dismiss the amended complaint and further urged the court to strike the complaint's class and collective action allegations under Federal Rule of Civil Procedure 12(f). See Fed. R. Civ. P. 12(f) (permitting court to strike "redundant, immaterial, impertinent, or scandalous matter" from pleading).

In April 2012, the court dismissed the amended complaint in its entirety. The court concluded that while the pleading had significantly increased in length, it failed to remedy the problems the court had identified in the original Manning I and Manning II complaints. The amended complaint, the court said, contained no factual matter indicating that defendants had a concrete policy in place that required BMC employees to work through their meal and rest breaks, before and after hours, or during their training

reference to "1 complaint" bears out the parties' description of the court's directive.

periods. Even assuming that such a policy existed, the complaint failed to demonstrate that any of BMC's managers or supervisors had knowledge of plaintiffs' unpaid work. Similarly, the court ruled that the claims against the individual defendants were insufficient to make out a plausible claim for relief, and that the plaintiffs' state common law claims were too conclusory to survive dismissal.

For related reasons, the court granted defendants' motion to strike the class and collective action allegations. The court noted that plaintiffs sought to represent numerous BMC employees who worked in a multitude of different positions. "[T]he existence of such 'policies,'" the court opined, "across a group of putative plaintiffs whose job function, hours, and daily tasks share little to no common ground is simply not plausible."

Finally, the court denied plaintiffs leave to file a second amended complaint, observing that plaintiffs' counsel had brought at least five other hospital compensation cases in the District of Massachusetts alone, and that similar cases against health care facilities were proliferating throughout the country. These cases used complaints that were "substantially identical" to the one at issue in this case, and the court observed that other district courts had routinely dismissed such complaints as insufficiently pled. Accordingly, the plaintiffs "have received the benefit of numerous rulings from federal judges . . . on the requisites for proper pleadings," and their continuing inability to

allege a cause of action attested to the futility of further opportunities to amend.

Having dismissed all claims with prejudice, the court entered judgment for defendants in Manning I and terminated Manning II on its docket. Plaintiffs took appeals from both cases. We consolidated those appeals for the purposes of briefing and argument.

**II.**

**A. The Sufficiency of the FLSA Allegations**

We exercise de novo review over a district court's dismissal of a complaint under Rule 12(b)(6). Uphoff Figueroa v. Alejandro, 597 F.3d 423, 429 (1st Cir. 2010). Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement "needs only enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).

We assess the sufficiency of the complaint's factual allegations in two steps. First, conclusory allegations that merely parrot the relevant legal standard are disregarded, as they are not entitled to the presumption of truth. Id. Second, we

accept the remaining factual allegations as true and decide if, drawing all reasonable inferences in plaintiffs' favor, they are sufficient to show an entitlement to relief. Id. The allegations must be enough to render the claim plausible: "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between [mere] possibility and plausibility of entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) (quotation marks omitted). We appropriately draw on our "judicial experience and common sense" in evaluating a complaint, id. at 679, but we may not disregard factual allegations "even if it strikes a savvy judge that actual proof of those facts is improbable." Twombly, 550 U.S. at 556. "The relevant question . . . in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.'" Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 569 n.14).

### 1. The Sufficiency of the FLSA Allegations Against BMC

Plaintiffs seek recovery under the FLSA for unpaid overtime compensation. The basic elements of a FLSA claim are that (1) plaintiffs must be employed by the defendants; (2) the work involved interstate activity; and, most importantly for present

purposes, (3) plaintiffs "performed work for which they were under-compensated." Pruell, 678 F.3d at 12. A claim for unpaid overtime wages must demonstrate that the plaintiffs were employed "for a workweek longer than forty hours" and that any hours worked in excess of forty per week were not compensated "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a)(1); see also Román v. Maietta Const., Inc., 147 F.3d 71, 75 (1st Cir. 1998).

The parties' arguments about the sufficiency of the allegations against BMC boil down to three issues: (1) whether the complaint sufficiently pleads BMC's actual or constructive knowledge of plaintiffs' undercompensation; (2) whether the facts alleged make out a claim that plaintiffs performed compensable work for longer than forty hours per week; and (3) whether each named plaintiff has sufficiently alleged that she worked compensable overtime.

### a. Knowledge

The FLSA defines the term "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). The parties agree that under this definition, "an employer's actual or imputed knowledge . . . is a necessary condition to finding the employer suffers or permits that work." Chao v. Gotham Registry, Inc., 514 F.3d 280, 287 (2d Cir. 2008); see also Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995); Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir.

-14-

1986). Actual knowledge is not required; "constructive knowledge will suffice." Holzapfel v. Town of Newburgh, 145 F.3d 516, 524 (2d Cir. 1998); see also 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time. . . . The employer knows or has reason to believe that [the employee] is continuing to work and the time is working time.").

Here, the complaint relies on a mix of actual knowledge and constructive knowledge theories. The pleading alleges that the employees' uncompensated work was performed "on defendants' premises during operational hours, and in full view of defendants' managers and supervisors." The pleading further states that plaintiffs had conversations with their managers about their uncompensated work. On "a number of occasions," employees directly questioned BMC managers about the practice of deducting time automatically from employees' paychecks, and the managers responded that the employees were "fully paid for their work time." Additionally, BMC managers regularly set performance deadlines that required employees to work through their designated breaks. As for the training sessions, defendants scheduled them to take place during regular work hours and led the required sessions, demonstrating that they knew that the trainings were taking place.

Defendants assail these allegations as too vague to support BMC's knowledge of employees' unpaid work. They argue that even though the allegations are factual in nature, "some

allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (citation omitted) (internal quotation marks omitted). Defendants note that the pleading is vague about a number of points, such as the identities and roles of the "managers" with whom plaintiffs spoke and the frequency and content of these purported interactions.

Rule 8 does not demand this degree of particularity. Even where direct allegations of knowledge are pled in a conclusory fashion, defendants' knowledge of unlawful conduct "may be inferable from other allegations in the complaint." Rodríguez-Reyes, 711 F.3d at 55; see also Grajales v. P.R. Ports Auth., 682 F.3d 40, 47 (1st Cir. 2012). Boiled down to its essence, plaintiffs' claim is that the intersection of several BMC employment practices frequently required them to work through their scheduled breaks, before and after work hours, and during training sessions. This work, often required by defendants, was performed in the open. Although defendants suffered and permitted this work to take place, they also knew that their automatic timekeeping system would deduct certain categories of noncompensable time from the employees' paychecks. Yet defendants did nothing to account for the extra time worked. These facts, taken in toto, are sufficient to establish a plausible inference of defendants'

knowledge. To require that plaintiffs, seeking to represent a whole class of individuals, describe the specific managers they talked with, and document, by time, place, and date, the instances in which they had a relevant conversation with those managers, would exceed Rule 8's requirement of a "short and plain statement" making out a claim for relief. See Grajales, 682 F.3d at 47 ("In connection with a threshold plausibility inquiry, a high degree of factual specificity is not required."). Here, the complaint sufficiently pleads that the employees were performing uncompensated work with defendants' constructive or actual knowledge.

### b. Compensable Work

The Supreme Court has defined "work" under the FLSA as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944); see also IBP, Inc. v. Alvarez, 546 U.S. 21, 25-30 (2005). Accordingly, not all activities an employee performs are necessarily compensable. See Pruell, 678 F.3d at 14 (discussing regulations excluding certain types of training or activities from FLSA's definition of work). The determination of whether an employee's activities constitute "work" depends not on "rigid per se definitions," but rather "the circumstances of the whole

-17-

activity." Reich v. ConAgra, Inc., 987 F.2d 1357, 1361 (8th Cir. 1993) (citation omitted) (quotation marks omitted); see also Gotham Registry, 514 F.3d at 286-87 (applying Tennessee Coal test to determine whether employees engaged in compensable activities).

In affirming the dismissal of a complaint raising similar allegations, our recent opinion in Pruell observed that "the amended complaint does not provide examples (let alone estimates as to the amounts) of such unpaid time for either plaintiff or describe the nature of the work performed during those times." 678 F.3d at 14. Defendants level a similar contention against this complaint, asserting that it fails to allege that plaintiffs engaged in compensable work with sufficient specificity.

While we agree that some of the complaint's allegations straddle the line between the conclusory and the factual, the pleading contains enough substantive content to elevate the FLSA claims above the mere possibility of defendants' liability. As discussed above, the complaint's gist is that because the employees' assigned tasks often need to be completed by certain times, and because of understaffing and lack of relief during meal and work breaks, BMC employees must frequently complete their regular working activities during their meal breaks or before and after their scheduled shifts. For example, Manning and Williams, who worked as nurses, spent this time charting, performing administrative tasks, monitoring patients, and providing treatment.

Rivers, a registered nurse, similarly used this time to assist patients who had difficulty sleeping. McCarthy, an administrative assistant, spent her uncompensated time placing and answering phone calls, drafting correspondence, and filing paperwork.

This work was essentially indistinguishable from work performed during the employees' regularly scheduled hours and "[s]uch work from [their] standpoint [was] fungible." Gotham Registry, 514 F.3d at 286. The fact that this assertion is not accompanied by a detailed list of each and every activity the plaintiffs and their fellows performed without compensation does not mandate the complaint's dismissal. "Work is work, after all," id., and we see no reason to demand such exhaustive detail.

### c. Overtime Worked

The parties debate whether the complaint properly alleges that each of the individually named plaintiffs worked more than forty hours in a given workweek, as required to bring a FLSA overtime claim. In support of dismissal, defendants rely heavily on the Second Circuit's recent opinion in Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106 (2d Cir. 2013), which is another hospital compensation case. There, the Second Circuit carefully examined each named plaintiff's allegations and discussed the likelihood that he or she worked more than forty hours in a given week. The Lundy court criticized the complaint's repeated use of imprecise words such as "occasionally" and "typically" to

-19-

describe the named plaintiffs' work hours. Id. at 114-15. This vagueness, combined with the fact that the amounts of purportedly uncompensated time were relatively small, provided "but low-octane fuel for speculation" that plaintiffs truly had worked enough hours to be entitled to overtime pay. Id. at 115.

Although defendants characterize the instant complaint as "strikingly similar" to the pleading at issue in Lundy, a close reading reveals otherwise. As to two of the four named plaintiffs, Rivers and McCarthy, the complaint alleges that they were regularly scheduled for forty-hour/week shifts. Any time that they worked during meal breaks, before or after their shifts, and in training periods, would thus entitle them to overtime compensation. A third plaintiff, Manning, was usually scheduled for thirty-six hour/week shifts, but "approximately once a month" her shift schedules resulted in a forty-hour week. Hence, approximately once a month, the alleged uncompensated time would put her over the numerical threshold.

The sufficiency of the allegations as to Rhonda Williams, who was employed by BMC as of the time of the complaint's filing, presents a closer question. The pleading states that "from January 2004 until 2006," she "typically" was scheduled for forty-hour workweeks. While this allegation would seem to bring her into the same category as Rivers and McCarthy, the FLSA imposes a two-year statute of limitations, extending to three years for willful

violations.  29 U.S.C. § 255(a).  This case was initiated in September 2009, meaning that Williams was not regularly scheduled to work forty-hour weeks within either limitations period.  From 2006 onward, Williams's "typical[]" schedule was reduced to twenty-four hours/week, which is plainly insufficient to bring her even close to the threshold.

Williams also alleges, however, that she was scheduled for a forty-hour week shift "at least once a year" after her regular hours changed.  During such a week, any hours she worked above the forty-hour threshold would entitle her to overtime pay.  As noted, the complaint's basic thrust is that defendants' pay practices continuously required BMC employees to work time for which they did not receive compensation.  This fact supports the reasonable inference that during any week in which Williams was scheduled to work forty hours, she also performed at least some uncompensated work.

Consequently, we conclude that the named plaintiffs, Williams included, have alleged enough to survive dismissal.

### 2.  The Individual Defendants

The FLSA claims are also directed against two individual defendants: Elaine Ullian, BMC's president and CEO from 1994 until 2010, and James Canavan, BMC's senior human resources director from 1997 until 2010.  FLSA liability attaches to any "employer," which is defined broadly to include "any person acting directly or

indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Courts have generally agreed that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable . . . for unpaid wages." Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983).

In Agnew, our seminal case on FLSA individual liability, we balanced "the shield from personal liability [that] is one of the major purposes of doing business in a corporate form" against Congress's clear refusal "to incorporate the common law parameters of the employer-employee relationship" into the FLSA. Id. at 1513. Examining the Supreme Court's precedents interpreting the FLSA and other employment statutes, we noted that they charted a middle course, applying a context-dependent "economic reality" test that looked to the totality of the individual's level of involvement with the corporation's day-to-day operations, as well as their direct participation in creating or adopting the unlawful pay practices. Id. at 1513-14. While recognizing the fact-based nature of this test, we admonished that courts should not apply the analysis in a manner that would "make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees." Id. at 1513.

-22-

We added substance to the economic reality test in _Baystate Alternative Staffing, Inc._ v. _Herman_, 163 F.3d 668 (1st Cir. 1998), explaining that

> [the] analysis focuse[s] on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits.  In addition to direct evidence of such a role, other relevant indicia may exist as well -- for example, an individual's operational control over significant aspects of the business and an individual's ownership interest in the business.  Such indicia, while not dispositive, are important . . . because they suggest that <u>an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA</u>.

_Id._ at 678 (emphasis added) (internal citation omitted).  We cautioned that these indicia must add up to something more than merely "the exercise of control by a corporate officer or corporate employee over the 'work situation'" generally, as otherwise "almost any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees." _Id._ at 679; _see also_ _Chao_ v. _Hotel Oasis, Inc._, 493 F.3d 26, 34 (1st Cir. 2007) (concluding that corporate officer was "not just any employee with some supervisory control over other employees," but rather was "instrumental in causing the corporation to violate the FLSA" (internal quotation marks omitted)).

Our FLSA individual liability cases typically address "a corporate officer with operational control of a corporation's covered enterprise," rather than a mere employee. Agnew, 712 F.2d at 1511 (two individuals who "together were President, Treasurer, Secretary and sole members of the Board of Directors"); see also Hotel Oasis, 493 F.3d at 34 ("president of the corporation"). We have similarly identified an ownership stake as highly probative of an individual's employer status, see Baystate, 163 F.3d at 678, as it suggests a high level of dominance over the company's operations. See Lambert v. Ackerley, 180 F.3d 997, 1012 (9th Cir. 1999) (approving jury instruction that individuals were liable if they had a "significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions" (emphasis added)); Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 140 (2d Cir. 1999) ("Because [the defendant] controlled the company financially, it was no idle threat when he testified that he could have dissolved the company if [the other defendants] had not followed his directions."). The company's profits also inure directly to an individual with an ownership interest, meaning that the individual "employs" the worker in a very concrete and literal sense. See Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 966 (6th Cir. 1991) (holding individual liable where "the evidence clearly demonstrates that [individual] was the 'top man' . . . and the corporation functioned for his profit").

This is not to say that the FLSA's definition of employer excludes those without high executive positions or ownership interests, as the economic reality test speaks broadly of individuals who have "operational control over significant aspects of the business." Baystate, 163 F.3d at 678; see also Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1310 (11th Cir. 2013) (observing that "a supervisor's title does not in itself establish or preclude his or her liability under the FLSA"). But the case law's emphasis on ownership and financial control is sensible because these factors suggest a strong degree of authority over the corporation's finances and, as a corollary, the ability to "caus[e] the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." Baystate, 163 F.3d at 678.

### a.  Elaine Ullian

Against this backdrop, we turn to the allegations against Ullian, BMC's former president and CEO. Plaintiffs say that Ullian "had the authority to, and did, make decisions that concerned the policies defendants adopted and the implementation of those policies." They claim that she exercised her dominance over BMC's operations by coordinating a major merger of several Boston area hospitals, overseeing the corporation's budget, and setting company-wide policy. She also was "involved in" a number of major employment-related decisions, including hiring employees from

-25-

community organizations, reducing jobs and services due to budget cuts, negotiating with unions, and ensuring that minorities were represented in BMC's workforce.

These allegations do not say that Ullian possessed any ownership interest in BMC, which we have identified as a significant factor in the individual liability analysis. Nevertheless, her role as BMC's president and chief executive officer suggests that she was in a position to exert substantial authority over corporate policy relating to employee wages. See Hotel Oasis, 493 F.3d at 34 (emphasizing that individual "was the corporate officer principally in charge of directing employment practices, [including] requiring employees to attend meetings unpaid, and setting employees' wages and schedules"). While allegations reliant solely on Ullian's position within BMC would not be sufficient to hold her individually liable, the complaint contains allegations indicating that she "controlled [the company's] purse-strings or made corporate policy about [its] compensation practices." Baystate, 163 F.3d at 678.

Specifically, Ullian was involved in an array of decisions related to managing BMC's finances. For example, she was involved in the hospital budget and made decisions to allocate substantial resources to certain projects. Moreover, she was "involved in the reduction of jobs and services" at BMC due to budgetary constraints, and was similarly involved in strategic

decisions to cut staff positions and reduce the company's spending. These assertions support the notion that Ullian had the authority to, and did, make critical decisions regarding the allocation of BMC's resources, thereby buttressing the inference that she had the type of operational control over the company that would give rise to individual FLSA liability.

The dissent notes these same factual allegations, but concludes that they are "merely consistent with" an inference of liability, Twombly, 550 U.S. at 557, rather than sufficient to raise a plausible claim. Although the dissent acknowledges that plaintiffs need not state "particular facts showing that an individual defendant made a specific decision or took a particular action that directly caused the plaintiffs' undercompensation," it criticizes the complaint for failing to show "that the plaintiffs' compensation was sufficiently within the defendant's bailiwick to justify holding her personally liable." It also takes issue with the complaint's lack of allegations "connecting Ullian to any component of" the timekeeping practices and work and training requirements that caused the systematic undercompensation.

But "[t]he relevant question . . . in assessing plausibility is not whether the complaint makes any particular factual allegations." Rodríquez-Reyes, 711 F.3d at 55. Instead, we look to whether, "taken in their entirety," the facts alleged are enough to state a claim. Id. With respect, we believe the

-27-

dissent devalues the familiar process of drawing inferences from "relevant indicia" of employer status, such as "an individual's operational control over significant aspects of the business." Baystate, 163 F.3d at 678.

Even after the complaint's conclusory and generalized assertions are discarded, the pleading discusses Ullian's involvement in employment, training, and payroll operations, her participation in recruiting activities, and decisions she made to reduce staff due to budget cuts. These allegations describe an executive who not only possessed, but repeatedly exercised the authority to establish company-wide policy regarding employment-related matters and made significant decisions regarding the allocation of financial resources that directly affected BMC's employees. These facts denominate concrete actions that had measurable and immediate impacts on BMC's workforce. Thus, the complaint raises a plausible inference not only that compensation-related matters were well within Ullian's bailiwick, but also that she "control[led the] corporation's financial affairs and . . . cause[d] the corporation to compensate (or not to compensate) employees in accordance with the FLSA." Id. at 678.

While specific allegations linking Ullian to BMC's automated timekeeping system or the practice of working through meal and rest periods would have further buttressed plaintiffs' FLSA claim, that kind of direct evidence is not essential to the

assertion of a plausible claim.  Moreover, demanding that type of allegation is often unrealistic at this stage when "some of the information needed may be in the control of defendants."  Pruell, 678 F.3d at 15.

Importantly, one of our prior opinions found individual FLSA liability in a nearly identical factual context.  In Hotel Oasis, we deemed the president of the corporation personally liable because he "had ultimate control over the business's day-to-day operations."  493 F.3d at 34.  The individual in question was the corporate officer "principally in charge of directing employment practices, such as hiring and firing employees, requiring employees to attend meetings unpaid, and setting employees' wages and schedules."  Id.  Notably, these facts were sufficient to establish a claim against the individual regardless of whether he possessed an ownership interest in company.  Id. at 34 n.9.  As enumerated above, the allegations against Ullian hew closely to the facts we found sufficient to establish individual liability in Hotel Oasis.  Consequently, the dismissal of the FLSA claims against her must be vacated.

### b.  Thomas Canavan

The complaint also seeks to hold Canavan, BMC's former senior human resources director, personally liable for the alleged FLSA violations.  Canavan lacks any ownership interest in BMC, does not serve as a high-level corporate officer, and is not a member of

the company's board of directors.  Unlike Ullian, he apparently occupied a position more akin to a senior employee than a corporate official.  Although FLSA's definition of "employer" does not necessarily exclude senior-level employees, our previous cases have not yet extended FLSA liability to such an individual.[4]

In view of the case law's emphasis on individuals with corporate officer status and/or an ownership stake in the company, and the lack of any such assertions relating to Canavan, the allegations as to his involvement in setting and enforcing the unlawful pay practices at issue become all the more important. Although there are such allegations against him, they are nothing more than unadorned assertions that are not supplemented by specific allegations supporting the inference that Canavan controlled BMC's purse-strings or made decisions about the allocation of financial resources.  See Baystate, 163 F.3d at 678; compare Donovan v. Grim Hotel Co., 747 F.2d 966, 971 (5th Cir. 1984) (finding individual liable when "he held their purse-strings and guided their policies," companies "were part of the . . . family business," and "functioned for the profit of his family"). As we have detailed, there were such allegations against Ullian.

_____

    [4] Indeed, plaintiffs have not identified a case where a circuit court imposed FLSA liability on a human resources manager who possessed no ownership stake in the company. But see Carpenter v. Refrigeration Sales Corp., 49 F. Supp. 2d 1028, 1031 (N.D. Ohio 1999) (ruling that head of human resources department was "employer" under Family and Medical Leave Act).

Their absence with respect to Canavan undermines any inference of individual liability.

Similarly, to say, as the complaint does, that Canavan had some involvement in "maintaining records" or "payroll functions" is not enough to support a reasonable inference of liability, given that plaintiffs nowhere assert that there was anything per se unlawful about taking automatic deductions from employees' time. If anything, these allegations are merely consistent with the notion that Canavan was performing his job functions, rather than engaging in conduct that led to the alleged violations.

For these reasons, the complaint does not state a claim against Canavan.

## B. The Arbitrability of Plaintiffs' FLSA Claims

Defendants also mount a challenge to the viability of plaintiffs' FLSA claims based on federal laws governing unions, including the National Labor Relations Act ("NLRA") and the LMRA. Although defendants' argument is somewhat hazy, we understand it this way. LMRA § 301 embodies a strong federal policy in favor of "protect[ing] the use of arbitration and grievance procedures common to CBAs." Cavallaro, 678 F.3d at 5. Thus, the LMRA exerts a strong preemptive effect over state law causes of action "so long as relief can be provided within the CBA process." Id. at 6. The FLSA, for its part, permits employers and employees to contract

about certain terms and conditions of employment, including the parties' definition of "work," as long as those contractual provisions remain consistent with the FLSA's provisions and purposes. Although the LMRA's broad protection of arbitration focuses on state law claims, defendants maintain that the FLSA claims similarly should be subject to the federal policy in favor of arbitrating disputes between employers and union workers regarding the payment of wages. The best way to do so is to require the unionized plaintiffs (Manning, Rivers, and Williams) to arbitrate their FLSA claims before proceeding to federal court.[5]

This "exhaustion" argument runs aground on well-settled case law governing the arbitrability of federal statutory claims.[6] In O'Brien v. Town of Agawam, 350 F.3d 279 (1st Cir. 2003), we addressed the argument that the FLSA claims of certain unionized

---

[5] We note that defendants do not address McCarthy, a nonunion plaintiff whose FLSA claims cannot be covered by a CBA. McCarthy's FLSA claims would thus appear to remain untouched even if we accepted defendants' view of the law.

[6] Plaintiffs maintain that defendants should have raised this argument in a cross appeal, because adopting it would alter or amend the judgment in defendants' favor. To the contrary, the district court's order dismissed plaintiffs' FLSA claims with prejudice. Accepting defendants' "exhaustion" argument would cause the same result -- the dismissal of plaintiffs' FLSA claims with prejudice. Affirming the dismissal using this reasoning would be an appropriate exercise of our ability to affirm on any basis present in the record, and no cross-appeal was necessary to put this issue before us. See, e.g., United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 958 (10th Cir. 2011); Smith v. Johnson & Johnson, 593 F.3d 280, 283 n.2 (3d Cir. 2010); Rivero v. City & Cnty. of San Francisco, 316 F.3d 857, 862 (9th Cir. 2002).

workers were "barred from federal court because they are essentially contract claims for unpaid overtime" and therefore subject to the CBA's grievance and arbitration procedures.[7] Id. at 284. We rejected this proposition, observing that "[r]ights conferred by Congress are conceptually distinct from those created by private agreement, and there is no authority for the proposition that rights under the FLSA merge into contractual ones whenever the two overlap." Id. at 285; see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (distinguishing between "contractual rights under a collective-bargaining agreement and individual statutory rights").

As a consequence, FLSA claims are not subject to a CBA's grievance and arbitration procedures simply because they address similar subject matter or because the CBAs define compensable "work." Indeed, the state of the law is somewhat unsettled as to whether a FLSA claim may ever be waived by a CBA.[8] Whatever the

---

[7] In a notable omission, both defendants and plaintiffs have failed to discuss or even cite Agawam in their briefs, despite its clear applicability to this case.

[8] The Supreme Court's opinion in Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728 (1981), contained broad language strongly suggesting that FLSA claims were never appropriate for arbitration. Id. at 742-45. But the Court's recent opinion in 14 Penn Plaza LLC v. Pyett, 556 U.S. 247 (2009), held that a provision requiring the arbitration of statutory age discrimination claims was enforceable, and indicated that unless a statutory scheme specifically removed a "particular class of grievances from the NLRA's broad sweep," a CBA's arbitration clause should be given full effect. Id. at 257-58. In reaching this conclusion, Pyett disapproved of Barrentine and similar opinions addressing other

answer to that question may be, the law is plain on one point: in order for a CBA to subject a federal statutory claim to arbitration, any such waiver must be "clear and unmistakable" on its face. Agawam, 350 F.3d at 285; see also Cavallaro, 678 F.3d at 7. The Supreme Court has repeatedly reaffirmed this rule. See Pyett, 556 U.S. at 260 (holding that union members' age discrimination claims must be subject to CBA's arbitration provisions because CBA "clearly and unmistakably requires respondents to arbitrate" them); Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 80 (1998) (holding that requirement contained in CBA requiring parties to arbitrate employment discrimination claims must be clear and unmistakable, and that "less-than-explicit" waiver was insufficient).[9]

_____

employment statutes, insofar as they suggested that federal statutory claims could not be addressed properly through arbitration. Id. at 265-72.

   Pyett strongly indicates that FLSA claims are indeed arbitrable. Some courts, however, have suggested that the FLSA's structure and language may distinguish it from the ADEA and other employment discrimination statutes for these purposes. Compare Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 883 n.2 (4th Cir. 1996) (observing that Title VII and Americans with Disabilities Act contain provisions encouraging arbitration, whereas FLSA does not), with Kuehner v. Dickinson & Co., 84 F.3d 316, 319 (9th Cir. 1996) (stating that employee was "[u]nable to identify support in the text or legislative history of the FLSA" for notion that FLSA excludes certain claims from arbitration). As we explain, we need not answer that question today.

   [9] Agawam and the other opinions discussed above defeat defendants' reliance on Leahy v. City of Chicago, 96 F.3d 228, 232 (7th Cir. 1996). There, a divided panel held that "if the [CBA's] guarantee of overtime compensation for time worked in excess of eight hours . . . protects [the plaintiffs'] FLSA rights to

As to what kind of provision would work a clear and unmistakable waiver, we have observed that "[a] broadly-worded arbitration clause such as one covering 'any dispute concerning or arising out of the terms and/or conditions of [the CBA] . . . ' will not suffice; rather, something closer to specific enumeration of the statutory claims to be arbitrated is required." Cavallaro, 678 F.3d at 7 n.7. For example, in Wright, the Court held that the CBA in that case was not sufficiently lucid when it contained "very general" clauses requiring arbitration of "'[m]atters under dispute'" and "'matters affecting wages, hours, and other terms and conditions of employment,'" without the "explicit incorporation of statutory antidiscrimination requirements." 525 U.S. at 80-81. In Agawam, we deemed insufficient arbitration language referring only to "'grievances,' which in turn [were] defined as allegations that the Town violated the CBA" without any reference to the "arbitration of statutory claims, let alone a clear and unmistakable waiver of a judicial forum for such claims." 350 F.3d at 285-86.

Here, the defendants cannot point to a single provision of the relevant CBAs that works a clear and unmistakable waiver of

---

overtime compensation, then the agreement is a defense to liability under the FLSA." Id. at 232. The Leahy court held that as long as the CBA grants workers all the protection the FLSA affords, then the CBA provides the exclusive means of vindicating the workers' FLSA rights and their claims must be dismissed. As Agawam explains, however, this analysis incorrectly conflates contractual rights with statutory ones. 350 F.3d at 285.

their FLSA claims. The CBAs' arbitration provisions do contain general grievance procedures, but define "grievances" as disputes or concerns arising out of the interpretation of the CBAs themselves. These provisions do not mention the employees' statutory claims, much less clearly or unmistakably agree to subject them to arbitration. Accordingly, nothing in the CBAs can even be remotely construed to require the plaintiffs to seek redress for their FLSA claims through the CBA's grievance processes.

In sum, a well-developed body of precedent dictates that a CBA's waiver of federal statutory claims must be clear and unmistakable. No such waiver exists in the CBAs at issue here. Consequently, the CBAs do not foreclose plaintiffs' claims under the FLSA.[10]

---

[10] Contrary to defendants' assertions, the LMRA and its attendant preemption doctrine do not support the arbitrability of plaintiffs' FLSA claims. As defendants acknowledge, this body of law typically addresses the effect of federal labor law upon state law causes of action and accordingly says little about the proper relationship between two federal statutory schemes. See Cavallaro, 678 F.3d at 4-5; see also Part II.C.1, infra. The Supreme Court and our opinion in Agawam have prescribed a different analysis when it comes to the latter circumstance. In short, defendants' reliance on LMRA preemption doctrine is simply a rephrasing of their "waiver" argument, and we accordingly reject it as well.

Similarly unavailing is defendants' reliance on Tamburello v. Comm-Tract Corp., 67 F.3d 973 (1st Cir. 1995), where we deemed a RICO claim "preempted" by federal labor law when the claim asserted a violation of federal labor law as a predicate act. Id. at 976-78. This case does not implicate Tamburello's unique posture, however, as here plaintiffs assert statutory rights that exist wholly independent of the CBA and do not depend upon its interpretation.

## C.  McCarthy's State Common Law Claims

Plaintiffs also challenge the district court's disposition of their state law claims, asserting that the trial court erroneously forced a nonunion plaintiff, McCarthy, to join her state law claims with the federal claims asserted by the other named plaintiffs, all of whom were union members covered by CBAs. In the alternative, plaintiffs argue that the district court erred in dismissing McCarthy's state law claims under Rule 12(b)(6).

### 1.  The Consolidation of McCarthy's Claims with the Union Plaintiffs' Claims

The state law claims at issue in this case had their genesis in Manning II, which began in the Commonwealth courts but was subsequently removed to federal court via LMRA complete preemption. "'Complete preemption' . . . applies where a purported state claim either is re-characterized as a federal claim or . . . is otherwise so related to federal law as to permit the removal." Cavallaro, 678 F.3d at 4. In the labor context, this doctrine reaches all "state law claims 'founded directly on rights created by collective-bargaining agreements' or 'substantially dependent on analysis of a collective-bargaining agreement.'" Id. at 5 (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987)). LMRA complete preemption thus transforms a claim pled under state law into a claim arising under federal labor law,

thereby establishing a basis for federal jurisdiction and changing the substantive law governing the claim itself.[11]  Id. at 5-7.

The three original plaintiffs in Manning II were all union members, and all asserted state law claims that the district court found to be substantially dependent on interpreting the CBAs, rendering them completely preempted.  Plaintiffs raise no dispute with this legal conclusion on appeal.[12]  Instead, they object to the district court's directive that the plaintiffs file a single amended complaint pleading the federal and state law claims that began as two separate cases in Manning I and Manning II. Plaintiffs observe that McCarthy, as a nonunion employee not covered by a CBA, had the ability to raise state law claims that were not completely preempted by the LMRA.  See Pruell v. Caritas Christi, 645 F.3d 81, 84 (1st Cir. 2011) ("So long as non-union plaintiffs pursue their own claims or represent others who are also

_____

[11] Complete preemption is rooted in § 301 of the LMRA, 29 U.S.C. § 185, which governs "[s]uits for violation of contracts between an employer and a labor organization representing employees."  Id. § 185(a).  Although the LMRA lacks an express preemption provision, the Supreme Court has construed this provision as supporting the preemption of state law claims.  See Cavallaro, 678 F.3d at 5 (discussing line of LMRA preemption opinions).

[12] In their reply brief, plaintiffs cite the complaint's allegation that Rivers joined a union only after having worked at BMC for approximately five years, and suggest that any claims arising out of Rivers's pre-union term of employment are not completely preempted.  The failure to argue this issue in their opening brief dooms any attempt to distinguish Rivers's claims. See Rubin v. Islamic Republic of Iran, 709 F.3d 49, 54 (1st Cir. 2013).

not covered by CBAs, that is a state case under state law."). But bringing McCarthy's claims as a separate action in the Commonwealth courts, plaintiffs say, would have violated the district court's directive to file a single consolidated complaint that included the putative class members' state law claims.

There is no evidence that the district court intended to preclude McCarthy from pursuing state law claims in state court. To recap, the three named plaintiffs who initiated both Manning I and Manning II were all asserted to be union members. At the time the district court directed plaintiffs to file a single consolidated complaint, these were the only three plaintiffs in the case. Thus, the district court understood the case to concern only plaintiffs who were union members, and plaintiffs cite nothing in the record showing that the district court was even aware of the existence of a named plaintiff who had the undisputed ability to assert nonpreempted state law claims. Based on the circumstances before it, the district court acted on the reasonable assumption that if the then-existent plaintiffs wanted to bring any state law claims, they should be joined with their federal causes of action. See 28 U.S.C. § 1367(a).

Even if the district court had been made aware of McCarthy as a plaintiff, exercising supplemental jurisdiction over her claims would have been more than appropriate, since they were undisputedly part of the same case or controversy. See Cavallaro,

678 F.3d at 5. To be sure, the exercise of this jurisdiction was within the court's discretion, and McCarthy could have moved to dismiss her particular claims without prejudice. See 28 U.S.C. § 1367(c) (permitting district courts to decline supplemental jurisdiction in certain enumerated circumstances). But McCarthy never requested the chance to bring her claims outside federal court. While the amended complaint includes a footnote stating that the state law claims were joined to the federal causes of action per the district court's directive, this vague notation says only that the plaintiffs "reserve all rights." McCarthy cannot now complain of the court's failure to address this issue when she did not put such a request before the court below.

Finally, to the extent that plaintiffs attack the district court's directive to file a single consolidated complaint, that contention is meritless. See Sutcliffe Storage & Warehouse Co. v. United States, 162 F.2d 849, 851 (1st Cir. 1947) (stating that "district court would be acting quite within its discretion in taking steps to consolidate or otherwise avoid the duplication of such closely similar cases, whatever the substantive rights of the parties").

For these reasons, all of the named plaintiffs' claims, both federal and state, were properly before the district court.

## 2. The Merits of McCarthy's State Law Claims

The district court grouped the state law claims into three categories: (1) contract and quasi-contract claims (Counts II-IV and IX); (2) fraud claims (Counts VII and VIII); and (3) unjust enrichment, money had and received, and conversion claims (Counts V, VI and X). To clarify the scope of this appeal, the district court ruled that insofar as these common law claims sought to recover overtime pay, they were preempted because they conflicted with the FLSA's comprehensive remedial scheme. Cf. Román, 147 F.3d at 76 (addressing preemption of Maine law and suggesting that "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA") (internal quotation marks omitted). The parties do not dispute this proposition. McCarthy's state law claims are accordingly limited to the recovery of "straight-time" pay, i.e., unpaid wages for non-overtime hours at her regular hourly rate.

Plaintiffs challenge the district court's conclusion that McCarthy's state law claims were pled in too conclusory a fashion to withstand dismissal. Defendants, for their part, urge us to adopt the district court's reasoning. In the alternative, they assert that all the common law claims are precluded or "preempted" by Massachusetts wage-and-hour statutes. We begin with the question of whether the Massachusetts wage-and-hour law precludes

McCarthy's common law claims, and then turn to the sufficiency of the complaint.

### a. The Effect of the Massachusetts Wage-and-Hour Statutes on the Common Law Claims

Defendants note that the district court dismissed the original Manning II complaint's statutory Massachusetts wage-and-hour claims because those statutes exempt "an employee of an incorporated hospital . . . which is conducted as a public charity," Mass. Gen. Laws ch. 149, § 148, and "any employee who is employed . . . in a hospital," id. ch. 151, § 1A(16). Defendants argue that McCarthy seeks to evade the force of these exemptions by clothing her statutory claims as contractual ones. They contend that all of McCarthy's common law claims are premised on the violation of Massachusetts wage-and-hour statutes, and that those statutes should be construed to "preempt" any recovery of unpaid wages through common law causes of action.[13]

We are not persuaded. When exercising diversity or supplemental jurisdiction over state law claims, we apply substantive state law. See Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011). In doing so, our duty is to "make an informed prophecy as to the state court's likely stance." Andrew Robinson Int'l,

---

[13] McCarthy contends that we are barred from evaluating whether Massachusetts wage-and-hour statutes preclude or displace their common law claims, since doing so would have the effect of enlarging the judgment in defendants' favor. For the reasons explained in footnote 6, supra, she is wrong. See Powell v. Schriver, 175 F.3d 107, 113 (2d Cir. 1999).

Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008). To begin, the Massachusetts courts have noted that duties arising out of a contract may be distinguished from those imposed by statute, and the two do not merge simply because they cover similar subject matter. Indeed, the Massachusetts courts have been clear that "an existing common law remedy is not to be taken away by statute unless by direct enactment or necessary implication." Eyssi v. City of Lawrence, 618 N.E.2d 1358, 1361 (Mass. 1993) (citation omitted) (internal quotation marks omitted); see also King v. Viscoloid Co., 106 N.E. 988, 989 (Mass. 1914) (same).

In Salvas v. Wal-Mart Stores, Inc., the Massachusetts Supreme Judicial Court ("SJC") applied these principles to a claim on behalf of a group of workers who alleged that their employer had deprived them of their meal periods without payment. 893 N.E.2d 1187, 1215 (Mass. 2008). There, the plaintiffs pled a cause of action under Massachusetts General Laws Chapter 149, § 100, for unpaid meal breaks, as well as a breach of contract claim based on the same deprivation. Id. Although the statutory claim failed because the relevant law did not provide for either an express or an implied private right of action, id. at 1216, the court held that "[t]he lack of a statutory private right of action presents no bar to the plaintiffs' claim that [defendant] violated a contractual duty to provide meal periods to the plaintiff class." Id. The SJC observed that "[t]o an hourly employee . . . , the

-43-

opportunity to stop work and eat a meal in peace during a busy workday may constitute a benefit of significant value," which the parties could bargain for in the course of establishing an enforceable contract. Id. at 1217. As a consequence, plaintiffs' inability to avail themselves of a remedy under the wage-and-hour laws did not preclude a common law claim that sought to vindicate distinct legal rights.

Salvas closely tracks this case. Although McCarthy cannot bring statutory wage-and-hour claims against defendants directly due to BMC's exempt status, that prohibition does not compel the erasure of her remedies at common law. See Eyssi, 618 N.E.2d at 1361-62 (holding that amendments to workers' compensation statutes did not bar common law loss of consortium action brought by spouse or child of police officer).

Seeking to conjure a contrary argument, defendants rely on two SJC cases that they read for the proposition that "[w]here a statute has been enacted seemingly to cover the whole subject to which it relates . . . other provisions of the common law . . . are thereby superseded." School Comm. of City of Lowell v. City of Lowell, 164 N.E. 91, 92 (Mass. 1928). But these cases do not sweep so broadly. For one, Lowell addressed a right that was "wholly the creature of statute" and that "[did] not exist at common law." Id. at 93. By contrast, the common law rights plaintiffs seek to vindicate here have long preceded the Massachusetts wage-and-hour

laws.  The other SJC case defendants cite, <u>School Committee of</u> <u>Boston</u> v. <u>Reilly</u>, 285 N.E.2d 795 (Mass. 1972), actually undermines their contentions.  There, the SJC considered the relationship between a criminal statute prohibiting municipal employees from engaging in strikes or work stoppages, and the terms of a CBA between the Boston school system and the teachers' union that also prohibited strikes.  <u>Id.</u> at 796.  When the teachers' union engaged in a work stoppage, the school district sued under the CBA and obtained an injunction.  <u>Id.</u> at 797.  Rejecting the teachers' contention that the criminal statutes provided the exclusive remedy for the union's conduct, the SJC saw nothing that "would warrant the conclusion that [the criminal statute's] enactment was intended to restrict previously existing common law remedies for breach of contract in the employer-employee context."  <u>Id.</u> at 798.[14]

In short, defendants have not identified any persuasive evidence that the Massachusetts legislature sought to eliminate longstanding common law causes of action through the wage-and-hour laws.  We therefore conclude that these laws do not preclude McCarthy from asserting the common law claims pled in this case.

### b.  The Sufficiency of the State Law Claims

---

[14] Defendants' remaining authorities consist of unpublished Massachusetts trial court opinions that are either inapposite or fail to engage with the doctrine described above.  We thus see no reason to adopt their reasoning.

We now turn to the sufficiency of the state law claims under Rule 12(b)(6), grouping them as the district court did into contract claims, fraud claims, and unjust enrichment claims. As stated above, the parties are in accord that these claims are for recovery of "straight-time" pay only.

### i. The Contract Claims

McCarthy contends that the district court "misapprehended that an employer-employee relationship is, at heart, a contractual one" and that the court erred in ruling that the amended complaint failed to allege a contract. We agree. While the complaint may not be larded with detail, the basic claim is clear. The defendants, by hiring and employing the plaintiffs, "entered into [] employment contract[s] with [them]." There is no requirement of greater formality to establish an employment contract. Indeed, "an informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace." Hishon v. King & Spalding, 467 U.S. 69, 74 (1984).

Per the complaint, the terms of this alleged contract were similarly straightforward -- McCarthy and her fellows would "provide their labor and services in a specified role for defendants, in exchange for an agreed upon hourly pay rate for 'all hours worked' by plaintiffs." "At a very minimum, an at-will employment relationship encompasses an agreement by the employee to perform specified work and an agreement by the employer to pay for

-46-

the work performed." Gasior v. Mass. Gen. Hosp., 846 N.E.2d 1133, 1137 n.7 (Mass. 2006). The heart of the state law claims is that, through the timekeeping and payroll policies detailed above, defendants breached the agreements and/or promises to pay all of the wages due. The complaint also includes allegations stating that defendants breached the duty of good faith by failing to pay plaintiffs for their hours worked, and that the employees relied, to their detriment, on defendants' promises to pay all the wages owed. While these factual allegations are relatively simple, so are the elements of a claim sounding in contract. We see no need to demand more specificity when the core assertion is obvious enough. Cf. Spears v. Miller, No. 1683, 2006 WL 2808145, at *3 (Mass. App. Div. Sept. 26, 2006) (observing that while "complaint was silent as to [employees'] precise employment arrangements," allegations that employer "employed them" and that employer "'agreed to pay' them 'legally mandated overtime pay'" were sufficient to state breach of contract claim).

For these reasons, the dismissal of McCarthy's claims sounding in contract must be vacated.

### ii. The Fraud and Unjust Enrichment Claims

The remaining common law claims may be disposed of more simply. As an initial matter, we note that McCarthy articulates no challenge to the district court's conclusion that the fraud claims did not meet the heightened pleading threshold set by Rule 9(b).

See Fed. R. Civ. P. 9(b) (requiring that fraud or mistake claims "state with particularity the circumstances constituting fraud or mistake"). Although McCarthy contends that the dismissal of the common law claims should be vacated insofar as it is based on the complaint's failure to plead knowledge, that pleading defect was not the basis of the district court's dismissal of the fraud claims. Due to the failure to provide any developed argumentation as to why the fraud claims should survive Rule 9(b), we affirm the dismissal of Count VII, the fraud claim, and Count VIII, the negligent misrepresentation claim. See Elena v. Municipality of San Juan, 677 F.3d 1, 8 (1st Cir. 2012) (deeming claim waived on appeal when plaintiffs "make no attempt at any analysis whatsoever, let alone developed argument").

By contrast, the district court's dismissal of the unjust enrichment, money had and received, and conversion claims was based entirely on its erroneous conclusion that the complaint did not sufficiently plead that "defendants required or had knowledge of the work allegedly performed by plaintiffs." See Part II.A.1.a, supra. Neither the district court nor defendants on appeal have proffered another basis for affirming the district court's order. Consequently, the dismissal of the unjust enrichment, conversion, and money had and received claims should be vacated.

**D. Plaintiffs' Class Action and Collective Action Allegations**

In addition to dismissing plaintiffs' substantive causes of action, the district court struck the class and collective action allegations. The amended complaint seeks both certification of a class action under Federal Rule of Civil Procedure 23 for the nonunion members' state law claims seeking straight-time pay, and a collective action under FLSA Section 16(b), 29 U.S.C. § 216(b), for the plaintiffs' FLSA overtime claims. Although Rule 23 and the FLSA impose different certification requirements, the district court used the same reasoning to strike both sets of allegations, and the parties by and large do not distinguish between the two regimes. We consequently assume that the same analysis applies to both.[15] For simplicity's sake, we refer to the relevant allegations as "class action" allegations.

The dispositive question for purposes of this appeal is whether the complaint pleads the existence of a group of putative class members whose claims are susceptible of resolution on a classwide basis. See Wal-Mart Stores, Inc., v. Dukes, 131 S. Ct. 2541, 2551 (2011) (holding that common issue of fact "must be of

---

[15] Conditional certification of a FLSA collective action requires that the putative plaintiffs be "similarly situated." 29 U.S.C. § 216(b). By contrast, Rule 23 calls for the class to share common questions of law or fact, Fed. R. Civ. P. 23(a)(2), and if certification is sought under Rule 23(b)(3), as is typical in wage-and-hour suits, that common issues predominate over individual ones, id. 23(b)(3). Although we treat class and collective certification requirements as the same for the purposes of this appeal, we do not suggest that this conflation is appropriate in all circumstances.

such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").  The Supreme Court has recognized that "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim."  Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982).  If it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis, district courts use their authority under Federal Rule of Civil Procedure 12(f) to delete the complaint's class allegations.[16]  See, e.g., Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 949 (6th Cir. 2011) (upholding striking of class allegations prior to close of discovery and motion to certify class).

Nonetheless, courts should exercise caution when striking class action allegations based solely on the pleadings, for two reasons.  First, while ruling on a motion to strike is committed to the district court's sound judgment, "such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion."  Boreri v. Fiat S.p.A., 763 F.2d 17, 23 (1st Cir. 1985).  This is so because "striking a portion of a

---

[16] In their reply brief, plaintiffs contend that the FLSA does not expressly require that the complaint plead the requirements of a collective action.  Because this assertion was raised too late, we do not pass upon its merits.

pleading is a drastic remedy and . . . it is often sought by the movant simply as a dilatory or harassing tactic."  5C Charles Alan Wright, et. al., Federal Practice & Procedure § 1380 (3d ed. 2011). Second, courts have repeatedly emphasized that striking class allegations under Rule 12(f)

> is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.

Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) (citations omitted) (internal quotation marks omitted); see also Cholakyan v. Mercedes-Benz USA, LLC, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011) (noting that "it is in fact rare to [strike class allegations] in advance of a motion for class certification" and collecting cases).  Accordingly, a court should typically await the development of a factual record before determining whether the case should move forward on a representative basis.

Here, the district court's analysis as to the class allegations was deeply intertwined with its dismissal of plaintiffs' substantive claims.  The court ruled that the facts as alleged did not suggest the existence of an "official policy" that applied to "each of the more than 50 discrete occupational classes plaintiffs claim make up the potential class."  What is more, the district court believed that the existence of such a widespread

policy across such a diverse group of employees was "simply not plausible."

As we have explained, however, the core of plaintiffs' allegations is in fact straightforward -- namely, that through a combination of timekeeping policies and other human resources practices, BMC employees were consistently required to work through their meal breaks and for periods of time before and after their regular work hours without compensation. This work took place openly at the hospital's facilities, with the employer's actual or constructive knowledge. Accepting the complaint's allegations as true, as we must, these facts support the plausible inference that this combination of policies affected BMC's employees across the board, notwithstanding their different roles within the company. Even if the court had concerns about plaintiffs' ability to represent such a diverse group of employees, those concerns do not justify the drastic measure of striking the class allegations in their entirety. Cf. Twombly, 550 U.S. at 563 n.8 ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."). Moreover, the district court has many tools at its disposal to address concerns regarding the appropriate contours of the putative class, including redefining the class during the certification process or creating

subclasses.  Cf. Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 197 (N.D.N.Y. 2009) (granting class certification in hospital compensation case, but excluding "non-patient care workers," such as cafeteria workers and security staff, because plaintiffs failed to show that these employees worked without pay with hospital administrators' knowledge).  Therefore, plaintiffs should have the chance to prove their assertions through discovery and a properly-brought motion for class certification.

Defendants suggest that plaintiffs invited the district court to resolve the class issues on the pleadings when they moved for conditional certification of a FLSA collective action on behalf of BMC employees affected by the alleged "meal break deduction policy."  We fail to see how plaintiffs' motion supports striking the class allegations at this early stage.  The mere fact that plaintiffs raised the issue to the court did not warrant confining the inquiry to the pleadings alone, and the trial court would have been well within its discretion to defer ruling on the conditional certification request until a later stage of the case.  See, e.g., Perez v. Prime Steak House Rest. Corp., ___ F. Supp. 2d ____, 2013 WL 1635527, at *8 (D.P.R. Apr. 17, 2013).  Moreover, plaintiffs point out that the district court elected not to address the evidence plaintiffs proffered in support of their motion for conditional certification.  This fact emphasizes the prematurity of

the district court's decision to strike the class and collective allegations on the pleadings.

Consequently, we must vacate the court's order striking the class and collective action allegations from the complaint.

**E.  Leave to Amend**

Finally, plaintiffs request that they be given leave to correct any deficiencies in the pleading, to the extent that the district court's dismissal is affirmed.  Federal Rule of Civil Procedure 15(a)(2) states that "[a] court should freely give leave when justice so requires."  This rule does not mean that "a trial court must mindlessly grant every request for leave to amend." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006). Leave to amend is appropriately denied when, inter alia, "the request is characterized by 'undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part.'" Calderón-Serra v. Wilmington Trust Co., 715 F.3d 14, 19 (1st Cir. 2013) (quoting Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006)).  We review the district court's denial of leave to amend for abuse of discretion.  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 131 (1st Cir. 2006).

Here, we affirm the dismissal of the FLSA claims against Canavan, as well as the fraud claims.  These claims were originally pled in the two separate complaints that initiated Manning I and Manning II, respectively.  The district court identified a number

of deficiencies in both of these pleadings, and the amended complaint now before us represents plaintiffs' attempt to cure those problems. While the trial judge could certainly have given plaintiffs yet another try, the court was by no means required to do so. This is especially true as to the fraud allegations, where plaintiffs fell far short of meeting the heightened pleading standard imposed by Rule 9(b). Although the district court was incorrect to dismiss all of plaintiffs' claims, it was within its discretion to conclude that the time had arrived to settle the pleadings.

We also observe that many of the hospital compensation lawsuits being brought throughout the country, including those litigated by plaintiffs' counsel in this case, use complaints that assert the same basic factual allegations and claims raised here. A number of courts have expressed their frustration with the lack of detail in these complaints. See Pruell, 678 F.3d at 14 & n.2 (collecting cases and noting district courts' "displeasure" with their complaints). While these cases may involve complaints that differ in some respects from the pleading at issue in this case, the dismissal of many of these similar allegations, including those written by plaintiffs' counsel here, should have put plaintiffs' counsel on notice of the necessity of a thorough drafting job. This circumstance further supports the trial judge's conclusion that giving them another chance would have served little purpose.

In sum, we must "defer to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial." Aponte-Torres, 445 F.3d at 58. Given the facts of this case we cannot say that denial of further leave to amend was an abuse of discretion.

## III.

For the reasons stated, we vacate the district court's order in part and affirm it in part. Specifically, we vacate the dismissal of the FLSA claim against BMC and Ullian (Count I), the contract claims (Counts II-IV, and IX), and the money had and received, unjust enrichment, and conversion claims (Counts V, VI, and X). We also vacate the district court's order striking the class and collective action allegations.

We affirm the dismissal of the FLSA claims against Canavan (Count I). We also affirm the district court's exercise of jurisdiction over the plaintiffs' state law claims, and the court's directive requiring plaintiffs to file a single consolidated complaint alleging all their causes of action. Further, we affirm the dismissal of the fraud and negligent misrepresentation claims (Counts VII and VIII), and the denial of leave to amend.

The case is remanded for proceedings consistent with this opinion. The parties are to bear their own costs.

**So ordered.**

**– Dissenting Opinion Follows –**

-56-

**STAHL, Circuit Judge, concurring in part and dissenting in part.** I join the court's thorough opinion in all but one respect. I part ways with my colleagues as to whether the plaintiffs have stated a claim against Elaine Ullian, BMC's erstwhile president and CEO. In my view, the plaintiffs' vague, boilerplate allegations do not nudge their claim against Ullian across the line from conceivable to plausible. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Thus, I respectfully dissent from the court's decision on this point.

As the majority explains, our precedents use an "economic reality" test to gauge whether an individual defendant is the plaintiff's "employer" for FLSA purposes.[17] See Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007); Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 678 (1st Cir. 1998); Donovan v. Agnew, 712 F.2d 1509, 1513 (1st Cir. 1983). This test "focuse[s] on the role played by the corporate officer[] in causing the corporation to undercompensate employees." Baystate, 163 F.3d at 678. "[R]elevant indicia" of employer status include the defendant's "operational control over significant aspects of the business" and "ownership interest in the business," if any; these

---

[17] The FLSA defines "employer" to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). This definition has aptly been called "unhelpful." Jackson v. Conrad, No. 09-00425, 2010 WL 3852343, at *1 (D.D.C. Sept. 30, 2010) (quoting Henthorn v. Dep't of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994)) (internal quotation marks omitted).

factors matter "because they suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA." Id.; see Hotel Oasis, 493 F.3d at 34. This focus on actual operational control means that "a supervisor's title does not in itself establish or preclude his or her liability under the FLSA." Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1310 (11th Cir. 2013).

Importantly, our cases warn against construing the FLSA definition of "employer" too broadly when ruling on claims against individual defendants. See Hotel Oasis, 493 F.3d at 34; Baystate, 163 F.3d at 679; Agnew, 712 F.2d at 1513. In our first encounter with individual liability under the FLSA, we concluded that "it should not lightly be inferred that Congress intended to disregard in this context the shield from personal liability which is one of the major purposes of doing business in a corporate form." Agnew, 712 F.2d at 1513. We thus eschewed a literal reading of the FLSA's "broadly inclusive definition of 'employer,'" which would impose personal liability on "any supervisory employee," and adopted the economic reality test instead. Id.; see Baystate, 163 F.3d at 679 (reaffirming that "such an expansive application of the definition of an 'employer' to a personal liability determination pursuant to the FLSA is untenable"). We should apply that test with this concern about unbounded liability in mind. See Hotel Oasis, 493

F.3d at 34 (describing Agnew as "narrowly" deciding that the FLSA "did not preclude personal liability" for officers with significant ownership interests and significant day-to-day operational control, including over compensation of employees, who personally made decisions leading to undercompensation); Agnew, 712 F.2d at 1513.

One other factor impacts how we must analyze the plaintiffs' claim against Ullian: this case, unlike Agnew, Baystate, or Hotel Oasis, was resolved on a motion to dismiss. Thus, for the plaintiffs' claim against Ullian to proceed, their complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). Put another way, the complaint's "non-conclusory factual content," Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 639 (1st Cir. 2013), must allow us to draw the reasonable inference that Ullian was the plaintiffs' "employer" under the economic reality test. This inference cannot rest solely on allegations that, "while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." Pruell v. Caritas Christi, 678 F.3d 10, 13 (1st Cir. 2012) (quoting Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011)) (internal quotation mark omitted). Here, the plaintiffs'

claim against Ullian relies on just such "borderline" allegations. See id.

Most of the allegations against Ullian amount to this: she was BMC's CEO and had many of the responsibilities one would expect a CEO to have. The complaint says that Ullian "controlled significant functions of the business"; "was involved in the budget for the hospital"; "was involved in regular presentations and meetings in the community on behalf of" BMC; "had the authority to, and did, make decisions that concerned the policies defendants adopted and the implementation of those policies"; "had the authority to, and did, make decisions that concerned defendants' operations, including functions related to employment, human resources, training, payroll, and benefits"; and was actively involved in recruiting, hiring, and reductions in force due to budget cuts. Thus, we know that Ullian had many of the high-level (if vaguely described) responsibilities that a CEO normally has, but our cases make clear that merely holding a high-level supervisory or executive position is not enough to trigger individual FLSA liability. See Agnew, 712 F.2d at 1513; see also Irizarry v. Catsimatidis, --- F.3d ---, 2013 WL 3388443, at *6 (2d Cir. July 9, 2013) ("Most circuits . . . [require] that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.'"). And many of the allegations that seek to tie

Ullian to the plaintiffs' employment situation are "nominally cast in factual terms but [are] so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint." Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012). For example: "As President and CEO, Elaine Ullian actively advised defendants' agents on the enforcement of the illegal policies complained of in this case." It is hard to imagine what facts underlie this assertion.

Some allegations are more specific: we are told of Ullian's role in overseeing a merger, constructing a new hospital building, implementing an electronic records system, setting policy regarding pharmaceutical and medical device representatives, and taking part in a rally supporting health-care services for the underprivileged. Taken together, these allegations plausibly establish that Ullian "had the authority to manage certain aspects of the business's operations on a day-to-day basis." Baystate, 163 F.3d at 678. But, in Baystate, that was not enough; we also called for some indication of "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act." Id. As the Second Circuit recently put it:

> Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status. Instead, to be an 'employer,' an individual defendant must

possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment.

Irizarry, --- F.3d ---, 2013 WL 3388443, at *8; cf. Patel v. Wargo, 803 F.2d 632, 638 (11th Cir. 1986) (defendant who was both president and vice president of a corporation, as well as a director and principal stockholder, was not an employer because he "did not have operational control of significant aspects of [the company]'s day-to-day functions, including compensation of employees or other matters 'in relation to an employee'" (citing Agnew, 712 F.2d at 1514)).[18]

The closest the complaint comes to alleging that Ullian had operational control over plaintiffs' employment and compensation is in the allegations that she: had the authority to hire and fire employees; sought to ensure minority representation in the workforce; was involved in layoffs; and "was involved in the negotiation with unions, including relating to the unfair labor practices of nurses." But these fairly broad allegations, even when read together with the rest of the complaint, see Ocasio-Hernández v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011), do not create a plausible inference that Ullian played a role "in causing [BMC] to undercompensate" the plaintiffs, Baystate, 163

---

[18]     This is not to suggest that allegations of an individual defendant's authority over other aspects of a business are irrelevant to the employer inquiry; they are not. See Irizarry, 2013 WL 3388443, at *8. But neither are they sufficient.

F.3d at 678. To be sure, I do not think our cases require, at the pleading stage, particular facts showing that an individual defendant made a specific decision or took a particular action that directly caused the plaintiffs' undercompensation. But something more than boilerplate assertions of "authority" is required; a complaint must present facts plausibly showing that the plaintiffs' compensation was sufficiently within the defendant's bailiwick to justify holding her personally liable.[19]  Cf. Agnew, 712 F.2d at 1513. Here, I see no such facts. The gist of the plaintiffs' complaint is that BMC's automated timekeeping system combined with its inflexible work and training requirements to cause systematic undercompensation. There are no allegations connecting Ullian to any component of this regime, let alone establishing that she had "operational control" over it. See Baystate, 163 F.3d at 678.

Finally, as the majority acknowledges, an individual FLSA defendant's ownership interest in the business is a major consideration under our precedents. See Hotel Oasis, 493 F.3d at 34; Agnew, 712 F.2d at 1511-12. Here, there is of course no allegation that Ullian had any ownership interest in BMC, which is

---

[19]  I call the complaint's allegations against Ullian "boilerplate" not only because of their vagueness but also because they mirror the allegations made against the individual defendants in other FLSA suits filed by the plaintiffs' counsel. E.g., Amended Complaint at 17-18, Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc., 10 CIV. 2661 PAC, 2011 WL 321186 (S.D.N.Y. Jan. 28, 2011) (No. 10-2661), ECF. No. 39.

a non-profit organization.  Moreover, BMC is a large organization. All else being equal, BMC's size makes it less plausible that the president and CEO had a hand in causing the employees' undercompensation than it would be in, say, a smaller, closely held company.  In sum, given the allegations in the complaint and our determination that an expansive definition of the term "employer" in this context is "untenable," Baystate, 163 F.3d at 679, I cannot conclude that the plaintiffs have stated a claim against Ullian.

I am cognizant that, before discovery, a plaintiff cannot know everything about a defendant's potentially wrongful conduct, especially when it comes to the inner workings of a corporate or institutional defendant.  Thus, our post-Twombly cases have recognized that "'some latitude' may be appropriate where a plausible claim may be indicated 'based on what is known,' at least where . . . 'some of the information needed may be in the control of [the] defendants.'"  Menard, 698 F.3d at 45 (alteration in original) (quoting Pruell, 678 F.3d at 15).  But "a plausible claim" is still required.  And Twombly and Iqbal make clear that a claim is not plausible when the "complaint pleads facts that are 'merely consistent with' a defendant's liability." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).  That is what we have here.  It is perhaps possible that Ullian is the plaintiffs' employer under the FLSA.  The allegations in the complaint are consistent with that possibility.  But broad assertions that Ullian

had authority that <u>might</u> encompass the requisite degree of control over the plaintiffs' employment do not "raise a reasonable expectation that discovery will reveal evidence of" liability. <u>Twombly</u>, 550 U.S. at 556. For that reason, I respectfully dissent from the court's decision that the plaintiffs have stated a plausible claim against Ullian. I join the court's opinion in all other respects.